## GOOLD and others *vs.* CHAPIN and MALLORY.

The proprietors of the Hudson River Line of towboats received on board one of their barges in the city of New-York, goods belonging to merchants in Brockport, to be by them transported to Albany, and there delivered to the agent of a company for transporting goods &c. on the canal, styled " *The Atlantic Line.*" The goods arrived safely at Albany on Monday, the 14th August, and were put on the *float* belonging to the owners of the barge, which they kept in the Albany basin for the purpose of receiving goods brought by their barges, and then transferring them to the canal craft, which came alongside of the float to receive their loading. On the 15th of August the agent of " *The Atlantic Line*" was notified on behalf of the proprietors of the Hudson River Line, that there were goods on their float for his line, and he was requested to call and take them away. The like notification and request were made to him on the next day, and repeated again on the 17th August; when the agent said he was taking some goods from another line, and when he got them on, he would shove up to the float and take those goods on. But on the same afternoon, the float, with the goods in question, was consumed by fire.

*Held,* 1. That the float in the basin was not, in any proper or legal sense of the term, a *warehouse.*

2. That placing goods upon this float was merely shifting them from one vessel of the carriers to another; and that it was clearly no delivery to the consignees, " *The Atlantic Line.*"

3. That had the carriers placed the goods in a warehouse at Albany, that being the place of delivery, so far as they were concerned, their liability *as carriers* would have been entirely discharged.

4. That by placing the goods in either of their own two warehouses, which it appeared from the evidence they had at Albany, and giving notice to the consignees, their undertaking and duties as carriers would have terminated entirely, and those of warehousemen commenced.

5. That inasmuch as they elected to retain possession of the goods, after notice, without depositing them in a warehouse, they were not entirely discharged from their liability.

6. That after the repeated notices given by them to the agent of " The Atlantic Line," of the arrival of the goods, with requests that he would take them away, their liability as insurers did not continue until the destruction of the goods; and that, under the circumstances, their strict liability as common carriers had ceased at the time of the fire, and that they were then holding the goods as bailees in deposit merely: and the goods having been destroyed without any fault on their part, that they were not liable.

Goold *v.* Chapin.

The liability of the carrier, *as insurer,* does not continue beyond the period of the arrival of the goods at the place of destination, and readiness for delivery, with notice of such readiness, where the consignee can be found.

THIS was an appeal from a judgment entered in favor of the plaintiffs, on the report of a referee. The defendants were engaged as common carriers in transporting goods from New-York to Albany. They were the proprietors of the "*Hudson River Line*" of towboats, and goods of the plaintiffs were put on board one of their barges, in the city of New-York, to be transported to Albany, and thence on a line of canal boats called the "*Atlantic Line,*" to Brockport, Monroe county. The defendants had two warehouses in the city of Albany, and a *float,* lying in the basin at that city, upon which they were in the habit of delivering their cargoes which were intended to go west, and transferring from the *float* to the canal boats, which came alongside, the merchandise to be forwarded by the respective canal lines. The barge on which the plaintiffs' goods were shipped arrived at Albany early on Monday morning, 14th August, 1848, and on the same day the goods were transferred from the barge to the *float.* On Tuesday, one of the men employed by the defendants in delivering goods from the *float* notified the agent of the "*Atlantic Line*" that there were goods on board of the defendants' *float,* for his line, and requested him to come and take them away. The same person went again to the agent of the *Atlantic Line,* on the next day, Wednesday, and met him on the dock, and told him that the defendants wanted him to come and take those goods away; and he again made the same request of that agent, as to taking away the goods, on the morning of Thursday, before the 17th August. About five o'clock in the afternoon of that day, the *float* and the plaintiff's goods were destroyed by the great fire. From the testimony of the agent of the *Atlantic Line,* who was called as a witness for the plaintiffs, before the referee, it appeared that when he received notice from the person employed by the defendants, that there were some goods on the *float* for the *Atlantic Line,* and that they wanted him to come and take them away, he replied that the *Atlantic Line* were taking some goods from another transportation line, and when

they got them on, they would shove up to the *float* and take the goods. This was in the morning of the day of the fire; and he did not recollect being requested, before the said Thursday morning, to take the goods away; that the defendants never charged any storage for putting into the *float*, goods that were shipped by the *Atlantic Line ;* and he had no knowledge that they ever charged storage on goods placed in the *float.* There was no evidence that the defendants' barge, on board of which the plaintiffs' goods were brought from New-York, was destroyed by the fire.

The plaintiffs claimed that under these circumstances the defendants were liable as common carriers, for the loss of the goods. The defendants, on the contrary, contended that the goods when put into the *float* were received into their possession as warehousemen, in which capacity they took reasonable and common care thereof, and exercised ordinary diligence in the preservation thereof from injury and destruction; and that while so acting in the capacity of warehousemen the goods were destroyed by fire; and that they, therefore, were not liable for the loss.

It was admitted before the referee, by both parties, that the great fire did not originate from any want of care or skill on the part of the defendants, but from some want of care on the part of some person about the stable where the fire originated, or from accident, and not by lightning. The referee reported in favor of the plaintiffs $552,94 damages, on the ground that he was of opinion that there had been no valid delivery of the goods to the *Atlantic Line.*

*Van Schaack & Olcott*, for the appellants, presented the following points and authorities. I. The contract of the defendants (the appellants) as carriers, was fully performed when the goods were delivered from their barge, and deposited in the float, and notice given to the agent of the *Atlantic Line.* ( *Garside* v. *Trent Navigation Company*, 4 *T. R.* 581. *Van Santvoord et al.* v. *St. John & Tousey*, 6 *Hill*, 167. *Thomas* v. *Boston and Prov. Railroad*, 10 *Metc.* 472. *Story on Bailm.* § 449.

*Angell on Carriers,* § 75.  1 *Denio,* 45.  *Chickering* v. *Fowler,* 4 *Pick.* 371.)  II. The defendants had a right to discharge themselves from the strict liability of common carriers, when the transit of the goods terminated.  It was wholly the fault of the Atlantic Line that the goods were not removed from the defendants' warehouse before the fire.  III. The referee erred in supposing that if there was not a delivery to the Atlantic Line, the defendants were liable.  The delivery was from the defendants as carriers ; this terminated their liability in that character, and in no other are they liable for the loss.

*S. B. Jewett,* for the respondents, (the plaintiffs,) presented the following points and authorities.  I. The defendants, as common carriers, were liable for any loss not occasioned by the act of God or the public enemies.  (*Angell on Carriers,* § 67.  *McArthur* v. *Sears,* 21 *Wend.* 190.  *Forward* v. *Pittard,* 1 *T. R.* 28, 33.  2 *Kent's Com.* 605.)  II. The loss in this case was not occasioned by the act of God.  (21 *Wend.* 196 *to* 198.  *Forward* v. *Pittard,* 1 *T. R.* 33.  19 *Wend.* 234, 251.)  III. The defendants' duty as carriers had not terminated at the time of the fire.  (*Angell on the Law of Carriers,* § 95.  *Fisk* v. *Newton,* 1 *Denio,* 47.  *Powell* v. *Myers,* 26 *Wend.* 591.  *Hollister* v. *Nowlen,* 19 *Id.* 236.  *Cole* v. *Goodwin, Id.* 251.  *Bourne* v. *Gatliffe,* 4 *Eng. Com. Law,* 337.  3 *Man. & Gr.* 645.  *Story on Bail.* § 639.  *Addison on Cont.* 810.  *Forward* v. *Pittard,* 1 *T. R.* 27.  *Abbott on Shipping,* 375, *Story & Perkins' ed. of* 1846, *pp.* 459, 460.  *Hyde* v. *Trent Nav. Co.* 5 *T. R.* 389, *opinions of Ashhurst and Buller, justices.*)  IV. This *float* on which the defendants placed the goods *was not a warehouse,* and was not regarded as such by the defendants, or those with whom they dealt.  (*Marshall on Ins.* 249, 250, 494.)  V. No custom was shown which aids the defendants in the least.  (*Ang. on Carr.* § 355.  *Gibson* v. *Culver,* 17 *Wend.* 305.)  VI. The real question in this case was one of fact.  That has been decided in the plaintiffs' favor by the referee, and the court will not disturb his finding.  VII. The policy of the law, holding carriers liable for the loss of goods without proof of negligence.

Goold *v.* Chapin.

requires that they should be held liable in this case. (*Forward*
v. *Pittard,* 1 *T. R.* 33.)

JOHNSON, J.   On behalf of the defendants it is contended
that their float in the basin was a warehouse, and that when
they had safely deposited the plaintiffs' goods there, and given
notice to the consignees, their contract as carriers was entirely
at an end.   I am of the opinion, however, that this float was not
a warehouse, in any proper or legal sense of the term.   It was
a mere floating craft used by the defendants for the exclusive
purpose of depositing goods transported by themselves, tempo-
rarily, until they could be delivered upon canal boats, and not for
general storage.   Placing goods upon this float, was merely shift-
ing them from one vessel of the defendants to another for the
convenience of delivery, and not for the purpose of storage.
And for all the purposes of this action, the goods might as well,
I apprehend, have remained upon the barge ready for delivery
when called for.   It was clearly no delivery to the consignees.
The goods were in the exclusive custody of the defendants, where
they were, doubtless, to remain until payment of charges for
transportation.

Had the defendants placed the goods in a warehouse at Albany,
that being the place of delivery so far as they were concerned,
their liability as carriers would have been entirely discharged.
(*Fisk* v. *Newton,* 1 *Denio,* 45.    *Van Santvoord* v. *St. John,* 6
*Hill,* 157.    *Thomas* v. *Boston and Providence Railroad Corp.*
10 *Metc.* 472.    *Story on Bailm.* § 449.    *Angell on Carriers,*
§ 75.)   The defendants had, as appears from the evidence, two
warehouses at Albany, one on the dock and the other on the pier.
By placing the goods in either of these, and giving notice to the
consignees, their undertaking and duties as carriers would have
terminated entirely, and those of warehousemen commenced.
But where the carrier does not deposit the goods transported by
him in a warehouse, at the termination of his route or voyage, or
deliver them safely to a third person for delivery, in the usual
course of business, I think all the authorities will be found to
agree, that the undertaking is not completed until actual delivery

Goold *v.* Chapin.

to the owner or consignee. Whether it continues in full force against the carrier as insurer, where the goods are not immediately accepted when offered, and to what extent the liability continues afterwards, is another question, which remains to be considered. That the defendants were not entirely discharged, inasmuch as they elected to retain possession of the goods after notice, without depositing them in a warehouse, is quite clear.

The referee found, from the evidence before him, that the goods had not been delivered to the Atlantic Line, the consignees, at the time of the fire; and *on that ground alone,* decided the cause against the defendants, as will be seen by his report. Were there no other questions in the case except those of delivery either to the Atlantic Line, or in a warehouse, there would be no difficulty in confirming this report. But here is a case presented, where obviously neither was done, when the goods were destroyed, although they had been several times before offered to the consignees, and at all times ready for delivery, for the space of two or three days. In this aspect, the case has not been considered, or passed upon by the referee. Under such circumstances, what is the liability of the common carrier? I am not aware that it has ever been decided how long the strict and entire liability of the carrier remains, after he has offered the goods, and only retains possession for the purpose of delivery and receiving charges for transportation. It is evident there must be some limit to it, unless, indeed, we are to hold that where the consignee or owner refuses or neglects to receive the goods when offered, the burthen of insurer in all cases remains upon the carrier, and can only be removed by handing them over to a third person, for safe keeping and delivery. There can be no reason in this, unless we are to discriminate between carriers and warehousemen as a trustworthy class, which we are not at liberty to do. If the carrier elects to keep the goods himself, exercising the same care and prudence which the law imposes upon the warehouseman, after he has offered to deliver, I do not see why he should not be at liberty to do so, under the same measure of responsibility. To the owner it is the same, and the rule should be the same in either case, unless some important

Goold *v.* Chapin.

consideration of general policy forbids. It is a grave question, and deserves a careful and deliberate examination.

The extraordinary liability of the common carrier as insurer of the property intrusted to him, is said to have been attached to his undertaking, not upon the ground of the reward he receives, but of the public employment he exercises, the danger of his combining with robbers, to the infinite injury of commerce, and "in that distrust which is the sinew of wisdom." These reasons may still apply with great force to the undertaking during the transportation of the property. But after its arrival at the place of delivery, and when it is in readiness for delivery, it is difficult to see any good reason why the law should impose any greater or different responsibility upon the carrier, while retaining it for the purpose of delivery to the owner or consignee, than upon the warehouseman, or other third person, to whom the carrier delivers it for the same purpose.

The contract, whatever it is, between the carrier and the consignor, should be enforced to its full extent, but not one step beyond. But, it must be seen that the obligation is not all on one side. It is as much a part of the contract, that the owner or consignee shall be ready at the place of destination to receive the goods when offered, or within a reasonable time thereafter, as that the carrier shall transport and deliver them. It can not be considered within the contemplation of the parties to such a contract that the consignee or owner may delay receiving the goods on their arrival, to suit his own necessities or convenience, and thus continue, indefinitely, this extraordinary risk of the carrier. Such an interpretation would put carriers completely at the mercy of consignees and owners, and be altogether too rigorous and unjust, to find any support or foundation in the common law. It certainly ought not to be in the power of one party to continue this exceedingly onerous liability a single hour beyond the just limits of the undertaking, as contemplated by the parties when it was entered into.

That the liability of the carrier, as insurer, does not continue beyond the period of the arrival of the goods at the place of destination and readiness for delivery, with notice of such

Goold *v.* Chapin.

readiness, where the consignee can be found, is, I think, well established. In *Stephenson* v. *Hart*, (4 *Bing.* 476,) it was said by Burrough, justice, " that when it was discovered that no such person as the consignee was found in *Great Winchester-street*, that contract was at an end, and the goods remaining in the hands of the carriers as the goods of the consignor, a new implied contract arose between the carrier and the consignor, to take care of the goods for the use of the consignor." In *Angell on Carriers*, §§ 320, 325, it is laid down that unless property is demanded at the place of destination after its arrival, within a reasonable time, by the owner, although the carrier is not discharged, his liability " in his strict character of *common carrier* will not continue," but he will hold the property afterwards, as a mere bailee, in deposit. This obviously just and rational rule was noticed and insisted upon by Verplanck, senator, in *Powell* v. *Myers*, (26 *Wend.* 591, 597.)

In this case the goods arrived at Albany on Monday, the 14th of August, and on Tuesday, the 15th, were upon the float ready for delivery, and notice given to the agent of the Atlantic Line. On Wednesday, the notice was repeated, and the agent requested to take them away, as the defendants wished to clear up their float. On Thursday morning, before the fire, the same notice and request were repeated. This was clearly proved, and in no way contradicted. For although Curtiss, the agent of the Atlantic Line, testifies that he does not recollect receiving notice but once, that week, that any particular goods were ready, yet he admits that he met the defendants' tallyman every day, and he might have given him the several notices as testified to by him. This being so, did the liability of the defendants, as insurers, continue until the destruction of the goods? Was it in the power of these consignees to protract this liability, for the space of three days after the defendants were ready, and had offered to perform the undertaking on their part? I think not. If they could do it for three days, I do not see why they might not for three months, or three years, or any indefinite period which might suit their necessities, convenience or pleasure. True, the defendants might have placed the goods in their own

warehouse, and thus have shielded themselves entirely. But I am of opinion they were not bound to do so, if they had another place of deposit, equally safe and convenient. I think it must be implied in every contract of this nature, that if the consignee is not found, or does not immediately accept the goods when offered, the carrier may, if he so elect, keep them as bailee, in deposit. His liability is not at an end entirely; but it assumes a different and less onerous character. There is no pretense that this float was not a place of as great safety as a warehouse. Indeed, it was expressly admitted upon the argument, that the goods were not lost by reason of any negligence on the part of the defendants or their agents.

The extraordinary and sudden calamity which destroyed the plaintiffs' goods, involved warehouses, and floats, and vessels alike. And although it can not with strict propriety be called the act of God, it must be admitted to be very nearly allied to that class of accidents not included in the risk of the carrier.

But, in my judgment, under the circumstances of this case, the strict liability of the defendants as common carriers had ceased at the time of the fire, and they were then holding the goods as bailees in deposit merely; and the goods having been destroyed without any fault on their part, they are not liable.

It is contended, by the plaintiffs' counsel, that this branch of the defense is not within the issue; and if it is, must be regarded as having been passed upon, by the referee, as a question of fact. It is quite clear, I think, that the defense is fairly within the issue, and equally so, that the referee did not pass upon the question of delay in receiving the goods. He must, according to his report, have determined as matter of law, that the defendants remained liable fully, as carriers, until the goods were actually delivered, irrespective of any questions of readiness and offers to deliver, on one side, or delay in receiving on the other. Besides, there was really no conflicting evidence on this branch of the case, and the question of law arose upon the undisputed facts.

I am of the opinion that the referee erred, and that the judgment of the special term must be reversed.

WELLES, J. concurred.

SELDEN, J. dissented.

Judgment of the special term reversed.

