## Case No. 12,267.

### SALMON FALLS MANUF'G CO. v. The TANGIER.

### GODDARD et al. v. SAME.

### PEARSON v. SAME.

[3 Ware, 110.][1]

District Court, D. Massachusetts. Oct., 1856.[2]

SHIPPING—CARRIERS OF GOODS — DELIVERY — NOTICE—WHEN TO BE GIVEN—DEPOSIT ON WHARF — BAILMENT — FAST DAY — SUSPENDED WORK PLEADING—JOINDER.

1. When a vessel arrives from a foreign port, and the master has safely moored his vessel at a suitable wharf, it is his duty to give early notice to the consignees of the cargo of his arrival, where his vessel lies, and that he is ready to deliver their goods. And the same rule applies to long coasting voyages.

2. The notice ought regularly to be given before the unlading is begun.

3. After such notice, and a permit is obtained, he may ordinarily, at a proper time and in the working hours of the day, proceed to discharge the cargo.

4. It is the duty of the consignees, on receiving such notice, promptly to be on the wharf to receive their goods as they are discharged from the vessel.

5. When the master, with such notice, has transferred the goods from the vessel and safely deposited them on the wharf, where and at a time when they can with reasonable convenience be received by the consignees, he has completed his contract as a carrier.

6. But this does not amount to a delivery until the consignee receives them.

7. A delivery, in the sense in which the word is used in a bill of lading, includes a transfer of the possession, actual or constructive, and with it the right and liabilities incident to the possession.

8. If the consignee is not present to receive the goods, or for any cause declines to do it, the placing the goods on the wharf is a tender of delivery that discharges the master as a carrier, but the goods remain in his custody with the responsibilities of an ordinary bailee for hire.

9. If after the unlading is begun and before it is completed, a fast day intervenes, the master, by the custom of the port of Boston, is authorized to continue the work as on an ordinary working-day, at least in the forenoon.

10. Or if the work has been suspended by the wharf being crowded, and it is then cleared, he may recommence the unlading without any new notice; and when the goods are placed on the wharf, he will be discharged as a carrier.

11. When several persons have causes of action of a like nature, and involving one or more questions common to all against a vessel, all may join in one libel.

12. In such case of joinder, the evidence touching the questions common to all is taken but once, and when these questions are decided, the cases become separate and independent, and each is litigated on its own merits.

[Cited in brief in The Pathfinder, Case No. 10,797.]

[These were libels founded upon bills of lading by the Salmon Falls Manufacturing

1 [Reported by George F. Emery, Esq.]
2 [Reversed in Case No. 5,494. Decree of circuit court reversed by supreme court in 23 How. (64 U. S.) 28.]

Company, Goddard & Pritchard, and John H. Pearson against the bark Tangier.]

Mr. Goodrich, for Salmon Falls Manuf'g Co.

Mr. Goodrich, for Goddard & Pritchard.

C. P. Curtis & C. P. Curtis, Jr., for Pearson.

Choate & Bell, for respondent.

WARE, District Judge. Before proceeding to examine these cases on their merits, it may not be improper to observe that some time and some expense would have been saved, if these three libels had been united in one; or if, before hearing the first, the three had been consolidated and heard together. They all involve one or more questions as to the liability of the vessel for the loss of the cotton under circumstances common to all. Such a joinder of parties, where several persons have causes of action of a like nature, and involving one or more questions common to all, is authorized by the general principles of admiralty practice. It has from time immemorial been the familiar usage in the case of seamen suing for their wages. But it is a right which extends to all parties in analogous cases. The supreme court has held that it extends to several consignees suing for damages sustained by their goods from the unseaworthiness of the vessel or the fault of the master. Rich v. Lambert, 12 How. [53 U. S.] 353. And I have supposed that it embraced suits by material men, where the liability of the vessel is a question involved. Such joinder is not only authorized by the general principles of admiralty practice, but is specially enjoined by the process act of July 22, 1813 (3 Stat. p. 19, § 3). The act, so far as it applies to proceedings in the admiralty, I understand to be merely in affirmance of the pre-existing law of the court. In such cases of joinder or consolidation, all the evidence touching the questions common to all the cases, is taken but once, and when these questions are decided, the cases become separate and distinct, and each party litigates his own on its own peculiar merits.

In this case one of the libels was heard and argued separately, and two were heard together; but in reviewing the evidence offered in all, I have come to the conclusion that they may all well be considered together, so far as the questions common to all are concerned, and I shall proceed to state my opinion on these questions precisely as though there had been a joinder or consolidation, noticing incidentally any matters that may be peculiar to either.

The bark Tangier arrived in Boston on Saturday, April the 6th, 1856, from Apalachicola, with a cargo of 998 bales of cotton, and on Monday a. m. was safely moored at Lewis' wharf. Of this cotton, 558 bales were consigned to Goddard & Pritchard, 100 to Pearson, and 100 to the Salmon Falls Manufacturing Company, and the residue to other

consignees. The master on Monday gave notice to the consignees of his arrival, of the place where his vessel lay, and that he was ready to deliver their goods. The unlivery was commenced in the afternoon, and was continued through the next forenoon, when, the cotton not being removed, the wharf became so full that the work was suspended. A new notice was given to Goddard & Pritchard, and to Pearson, on Tuesday, and they still neglecting to remove their cotton, were hastened by a third notice on Wednesday morning. But it is, on the evidence, not so certain that a second notice was given to Aiken, the agent of the Salmon Falls Co. Wednesday afternoon, all the cotton which had been unladen Monday and Tuesday was removed, with the exception of 325 bales, which remained on the wharf over night. The wharf was now so far cleared that the unlivery was resumed and completed by about 1 o'clock Thursday. None was removed that day, except four or five bales by Goddard & Pritchard, and between two and three o'clock the cotton remaining on the wharf was consumed or damaged by an accidental fire. Of G. & P.'s cotton. 163 bales had been received and taken away, leaving 425 bales. Of the Salmon Falls Company's cotton, 30 bales had been removed by their agent, and 65 were burnt or damaged, and of Pearson's, 25 had been taken and 75 were left for the fire.

On this state of facts, libels are brought against the vessel, and she is arrested as responsible for the default of the master in not delivering the goods according to the terms of the bills of lading. The whole case, both on the evidence and the law arising on the facts, has been most thoroughly and ably argued on both sides; and it only remains for me to express the best opinion I have been able to form of the result. With respect to the principal matters of fact on which the decision must turn, there is, I think, but little difficulty; but they involve some questions of law, which appear to me of no inconsiderable delicacy, and to be not wholly free from doubt.

The first question, which has been urged, is whether the master is exempted from the loss by fire, by virtue of the act of congress of March 3, 1851 (9 Stat. p. 631, c. 43). The second is, admitting that he is not exempted by the statute whether upon the facts proved in this case he is liable for the loss on the general principles of the maritime law. And thirdly, under this, a considerable portion of the goods having been landed on the tenth day of April, which was appointed by the governor a general fast day, whether this was a day, in which, by the custom of the port, the master was authorized to discharge his cargo.

I shall first consider the second question that has been argued. These libels are all founded on bills of lading, in the common form; shipped in good order and condition on board the barque Tangier, at Apalachicola, and to be delivered in like good order and condition at the port of Boston to the consignees—dangers of the sea only excepted. Loss by fire is not in the sense of the law one of the dangers of the seas excepted in the bill of lading, and the master stands as an insurer against all others. Nothing short of a delivery can relieve him from the obligation of his contract, or some excuse for the non-delivery, which the law will hold to be sufficient, notwithstanding his contract. Has there been, then, a delivery? The contract is not merely to deliver at the port of Boston, but to deliver to the consignees named in the bills of lading. In its terms it requires a delivery to the person. A delivery to a drayman, employed by him, would, in legal intendment, be a delivery to him. But the words of a bill of lading in their natural and ordinary meaning, appear to import a personal delivery; such a delivery as is required in the case of a sale, in those systems of law and in those cases where a delivery is required to consummate the contract and operate a transfer of the property. And in those cases it must include a transfer of the legal possession, so as to exonerate the vender or the person making the delivery from all the responsibilities attached to the possession, and to place the risk on the other party. For this purpose it is true that an actual manucaption of the goods is not necessary. There may be a constructive or a symbolical delivery in its legal effects equivalent to an actual delivery, as the delivery of a raft of lumber lying in a lake or river by the vender pointing it out to the sight of the vendee, or the delivery of goods in a warehouse by the delivery of the key, with a sufficient description of the goods. In these cases, though there is no passing the goods from hand to hand, traditio, there is a legal transfer of the possession and the risk of the goods is shifted to the purchaser, or to the person to whom the delivery is made under any other contract, as much as though they had actually been put into his hands. A delivery in the strict and proper sense of the word seems to me always to imply this transfer of the possession, actual or legal, and with it the rights and responsibilities attached to the possession. One consequence involved in this doctrine is that to complete the legal delivery there must be an acceptance, actual or implied. This, as I think, is the sense in which the word is used in bills of lading, and in the delivery of the goods. The argument of the claimant's counsel tacitly admits that there has been no such delivery as transferred the legal possession with the rights and obligations incident to it. His argument is that the discharge of the goods on the wharf with notice was a tender of the goods that completed the whole duty of the master as carrier.

It was the termination, a complete performance of that contract with all its peculiar

responsibilities. But it is conceded that another obligation immediately followed, that of custody, to protect the property from plunderage and other loss; and that this obligation was not merely that of a depositary bound to slight diligence only, but that of a bailee for hire, having his compensation for this service in his freights. The master also considered his obligation in the same light, for he kept guard over the cotton during the whole time it was on the wharf, by his own men in the day time on board his ship, and by a hired watch in the night. If there was no delivery in the strict and technical sense of the word, has the master any excuse for the non-delivery? I agree with the counsel for the libellant that the master's contract, though it consists of two parts, is a legal entirety; it is to carry and deliver. The carriage, the transportation of the goods from port to port, is his own independent act, which he can perform alone, without the aid of any other party. That is accomplished when he has transported them from the port of lading to the port of delivery, and safely deposited the goods on the wharf. Thus far he is a carrier, and here this part of his contract, that is for carriage, is complete. In transportation by water in sea-going vessels the carrier is not bound to carry the goods to the warehouse of the owner or consignee, however it may be in some cases of land transportation. The place of delivery is the wharf. The second obligation, that to deliver, remained to be performed. Now this is an act which the master cannot perform alone. It requires the concurrence of the consignee. All that the master can do alone is to deposit the goods at the place, where the delivery is to be made, and offer them to the owner named in the bill of lading. If he is not there to receive them, then the master is bound, in cases like this, of maritime transportation, by custom, for the care and custody of the goods until the owner comes to receive them. If he does not come at all, then he is bound to have the goods housed in a safe and proper warehouse at the owner's expense. If the owner or consignee does come, and for any cause, declines to receive the goods, it is certain that there is no delivery; it is, I think, equally certain, that there is an offer or tender of delivery. But the master is not thereby discharged from all care of the goods. He is bound to the duty of custody, precisely as though no owner had called for them, and to have them properly warehoused.

This I take to be the universal custom, and sanctioned by law. Then comes up the important question, was he bound for the safe keeping of the goods as a carrier, or only as a bailee for hire. The distinction between the liabilities of the two makes all the difference in these cases. As a carrier he will be liable for their loss, but as a bailee for hire, the loss being purely fortuitous, and he not in fault, he will be exempt from liability. My

opinion, both on principle, the reason of the thing, and the authority of judicial decisions, is that he was discharged from his engagement as a carrier, and remained liable only as an ordinary custodian having a compensation for his services. The duties of the parties with respect to the delivery of goods from seagoing vessels, I suppose to be quite clear and well-defined. It is that the master, as soon as his vessel is safely moored at the wharf, give notice to the owners and consignees of his arrival, of the place where his ship lies and that he is ready to deliver their goods. As the delivery is to be on the wharf, it is the duty of the consignees to be present and receive them as they are discharged from the vessel. Goold v. Chapin, 10 Barb. 612. In the business of maritime trade, promptitude and despatch are expected of all parties. Ships, whose employment is on the sea, are obliged to wait the opportunities of wind and weather, and do not willingly brook delay where these are favorable. The master has also a just motive for hastening the discharge of his vessel, in order to relieve the owners from the expense of demurrage, and to get his ship ready for another voyage. He has another motive not less legitimate, to liberate himself and his ship from the onerous liabilities of a carrier. And this, I think he does as soon as with notice he places the goods safely on the wharf. He is not bound to wait the convenience of dilatory consignees. If they are not present, and inconvenience or loss results from their neglect, it is not the master's fault, and every one must bear the burthen of his own faults. The placing the goods on the wharf at a suitable time when they may be received by the consignee, appears to me to be a tender of delivery, that discharges the master as a carrier, whether the consignee is there to receive them or not. There certainly must be sometime when the master may relieve himself from the responsibilities of a carrier without the concurrence of the other party. He may do so by a tender, and if that tender is not a perfected act when the goods are first put on the wharf, how long must they remain there for that purpose? Shall the time be fixed for an hour, or a day, or longer; for such goods as cotton are not unfrequently left on the wharf for several days before they are taken away. If we do not take the time when they are first put on the wharf, I am entirely at a loss in determining when the time shall be fixed.

My opinion is, that placing the goods on the wharf at a suitable time, with proper notice where they may be received, is a tender of delivery that discharges the master as a carrier, as much as an actual delivery. It is a general principle of law resting on broad foundations of natural justice and applicable to a great variety of cases, that where a person is bound to perform a certain act for the purpose of discharging himself from an obligation or acquiring a right, an offer or a

tender of performance, properly made, is equivalent to an actual performance for the purpose of relieving himself from the obligation or of acquiring the right. In the Roman law it is put into the form of a maxim, and is inserted among the regulæ juris. In all cases an act is considered as done, when the delay of the other party has prevented its being done. "In omnibus causis pro facto accipitur id in quo per alium morae sit, quominus fiat." Dig. 50, 17, 39. A person who is ready and willing to perform his contract or obligation shall not be deprived of the benefit of performance by the malice, caprice, or neglect of another party.[3] The usual and proper notice was given of the vessel's arrival, and I think that one notice was sufficient. It was the right of the master, after the unlivery was begun, to continue the work until it was completed, as fast as the goods could conveniently be removed. If it became necessary by the encumbering of the wharf to suspend the work for a time, the fault was not his; for it appears from the testimony that the cotton might have been removed as fast as it could be discharged. In the case of the Salmon Falls Company, an objection is made to the sufficiency of the notice. It is said that it was not until after the unlivery was begun. Without doubt, regularly it should be before. There is some doubt, I think, as to the fact, but admitting it to be as contended, if the fire had happened before the notice, it would deserve very grave consideration. But the fire occurred three days after, and the party suffered nothing from this irregularity. The objection is purely technical in its application to this case. And though in a case of purely fortuitous loss like this, a party is not to be censured for resorting to the subtleties of the law to escape, the objection appears to me to be too high among the apices of the law to be applied to the transactions of merchants and shipmasters. My opinion on principle is that the landing on the wharf, with the notice given, was equivalent to an actual delivery, for the purposes of these actions, supposing the time to be unobjectionable, which will be considered presently.

My opinion also is that the decisions of the courts and the language of elementary writers lead to the same conclusion. The authorities cited by the counsel for the claimant appear to me fairly to support this doctrine. Story, Bailm. § 545; 2 Kent, Comm. 604, and the notes to the 6th Edition; Norway Plains Co. v. Boston & M. R. Co., 1 Gray, 271; Cope v. Cordova, 1 Rawle, 203; Hyde v. Trent & M. Nav. Co., 5 Term R. 389; Goold v. Chapin, 10 Barb. 612. The Boston & M. R. Co., in 1 Gray, is certainly a very strong case and was evidently decided on very deliberate consid-

eration. That, it is true, was a case of land transportation, but the principle of the decision applies to the present case. The principle, as I understand it, is this: when the carrier has transported the goods to the place, where, by custom or agreement, they are to be delivered, and has safely deposited them so that they may be received by the owner, he has completed his engagement as a carrier, and his responsibilities, in that character, are at an end. It was therefore held, that as soon as the goods were transferred from the cars to the platform, the road ceased to be a carrier, and from that moment was liable only as a warehouseman, and the goods during the night having been destroyed by an accidental fire, the loss fell on the owner.

The authorities relied upon by the other side, do not appear to me, when fairly examined, to militate against this doctrine. Price v. Powell, 3 N. Y. 323; Miller v. Steam Nav. Co., 13 Barb. 361; Gatliffe v. Bourne, 4 Bing. N. C. 314; and same case, 3 Man. & G. 643, and in 11 Clark & F. 45. The case of Gatliffe v. Bourne, which was litigated through all the courts and finally decided by the house of lords, was, in its leading facts, very much like the present. The goods were landed on the wharf in London, on the 29th of August, and burnt the following night by an accidental fire, and the carrier was held liable for the loss. The case was argued and decided on the allegations in the pleadings, and in those it differed from the present case in two material particulars. First, it did not appear that the consignees were notified of the arrival of the vessel; and secondly, it did not appear that the goods were landed at a suitable time for the consignees to receive and take them away. One of the judges observed that for anything that appeared in the record, the goods might have been landed in the night time (though from evidence at the trial, it appeared that the unlading was between 11 o'clock a. m. and 2 p. m.). Mr. Angel, after a copious examination of authorities, states in substance, as the true result of the whole, that when goods are to be delivered at a particular place, due and reasonable notice giving the consignees a fair opportunity to receive and take them away, comes in lieu of an actual delivery for the purpose of discharging the party from the obligation of a carrier (Ang. Carr. § 313); that is, though, not a delivery, in fact; it is a tender of delivery that completes his contract as carrier. Having this view of the law, it is, to my mind, quite clear that the master cannot be held liable for the loss of so much of the cotton as was discharged as early as Tuesday noon. Whether he may be for that, which was discharged Thursday depends entirely on the question, whether Thursday was a suitable and proper time for the delivery of the cotton under the circumstances of these cases. If it was, the consignees were bound to be on the wharf and receive it. If it was not, they were not so

---

[3] If any authority is required for so plain a principle of natural justice, some may be found referred to in The Palo Alto [Case No. 10,700], where it was applied in a case of considerable delicacy.

bound, and the master is no more relieved from his obligations as a carrier, than he would be by discharging it at an unseasonable hour in the day or in the night time.

This brings up the question which I have found the most embarrassing in the whole case, not only as involving legal considerations of delicacy as to the effect of the custom of the port, to which the attention of the courts of the state does not seem to have been called, but because it is pretty apparent from the testimony that the question cannot be decided one way or the other without encountering and doing some violence to the cherished habits and feelings of considerable and highly respectable portions of the community. On the part of the libellant it is contended that fast day has, from the first settlement of the commonwealth, been observed as a day of rest, when the usual secular employments of life are suspended, and is therefore not a suitable and proper time for discharging vessels; that the consignees are not bound to be present with their teams to receive their goods, and consequently, when the master discharged the cargo that day, he did it in his own wrong. To maintain this, the governor's proclamation is put into the case, setting apart that day as a day of fasting, humiliation and prayer, and recommending to the people to assemble in their usual places of public worship and devote the time to religious duties, which manifestly implies a suspension of the ordinary secular labors of life. This custom is attested by a regular series of public acts of the executive, commencing with the earliest history of the commonwealth, and continued to the present time. It is contended that it is a well known historical fact, of which the court will take notice without formal proof, that the day, from the first settlement of the country, and for a long period after, has been observed according to the governor's recommendation as a day of rest. If this be a fact of which the court can judicially take notice, and I am inclined to think it is, then this consequence follows; a particular custom, that is, a particular state of things having been shown to exist at a former time, that is presumed to continue until the contrary is proved. It will follow that fast day, prima facie, cannot be considered as a proper and suitable time to require consignees to receive their goods. But if fast is such a holiday, it is so merely by the force of custom, and not like Sunday, by positive law. And for the purposes of the present hearing it is such no farther than the present custom makes it so. What custom has made custom may change, and the rights of the parties, as they are affected by the custom, are to be determined by the custom as it now is, and not as it was at any former time. So that the only effect of this presumption is to shift the burthen of proof and require the claimant to show that, whatever may have been the historic custom, it has become so changed in the

progress of time, that fast day, according to the present usage, is a suitable and proper time for the transaction of the particular business, the consideration of which is involved in these cases. For we are not required to travel out of the case to determine the general character of the day. For this purpose a large number of stevedores were called and examined; a class of persons by whom the discharging of vessels is exclusively performed. Without going into detail, the general result of their testimony may be stated in a few words. They are generally, not perhaps universally, disinclined to commence the discharge of a vessel on fast day; but if they have one on hand begun and a fast day intervenes, they do not suspend the work, but it is invariably continued, and it is continued as a matter of course, whether the draymen are on the wharf to receive the goods or not; and this is done under the general notice. No special notice on account of the fast is given, that the unlivery will be continued. If the cargo consists of goods not liable to be injured by exposure (and cotton is one of those articles), they are put on the wharf and left with no other protection than a common watch. If it consists of goods liable to injury from exposure or wet, and they are not taken away, the work notwithstanding goes on, and the goods are put under cover or housed. Still, it is apparent that the day is not regarded, even by the stevedores, precisely as a common working day. They are generally, if not universally inclined to take part of the day for rest or recreation, and ordinarily break off with the dinner hour unless in cases of urgency. Such is the testimony of a large number of stevedores, who have for many years been engaged largely in this business.

The next most material testimony in relation to the custom comes from the draymen, who receive the goods on the wharf and carry them away. The stevedores are employed by the master, the draymen by the owners and consignees of the goods. Their testimony allowing for some slight difference arising from individual tastes and habits, is pretty uniform. They are disinclined generally to turn out their teams on that day, and ordinarily do not. To the teams it is for the most part a day of rest. But the exceptions are far from being infrequent. And on the day of this fire the draymen employed by one of these consignees had five teams out carting iron through the streets to the distance of three-quarters of a mile. In cases of urgency, and these are pretty frequent where vessels are partly discharged, they generally consent to go out with their teams.

A third source from which the most direct evidence respecting the custom is derived, is the testimony of merchants. A considerable number were examined, who have been for many years largely engaged

in commerce, both as importers and ship owners. Their testimony is invariable and without exception that they know of no custom of receiving goods from vessels fast day, but that the custom as far as their knowledge extends, is the other way. Their stores are not opened for business, and some of them add that in an experience of active business for twenty or thirty years they have never had a consignment of goods delivered that day.

Such is the general complexion of the proof coming from persons whose employment and profession has necessarily led them to be familiar with the custom of the port in this particular. But there is other testimony of a general character, which has a bearing more or less direct on the case. It comes from persons whose business and habits carry them to the wharves, and who have ample opportunities of observing what is going forward. From the whole testimony it is apparent that there is much less stir and activity on that than on any common working day. Many, if not a majority of the stores are closed, but many also are partially open. There is not more than one-half the usual amount of any kind of business done, and not more than one-quarter of the trucking, and this is mostly confined to the forenoon. The railroad depots are not open for receiving freight, and no freight train is run. But the general express office is open, both for receiving and delivering goods. And the day is so far properly a holiday, dies feriatus, that the custom-houses and banks are closed; and the churches are in part open, though thinly attended. Such is the general outline of the evidence as I have gathered it from a minute and critical examination of the witnesses. And the question is whether the discharging of goods fast day under the custom of this port, and the circumstances proved, amounted to a legal tender of delivery, that completed the contract of the master as a carrier, admitting that such would be the effect of a discharge on a common working day.

On the whole evidence it appears to be quite clear that the customary observance of the day has been, perhaps is now, undergoing a change. It has lost much but not the whole of its ancient sanctity as a day of religious quiet and abstraction from secular cares and employments, without having yet acquired any other distinct and well marked character. Practically, it is in part a working day; at least, in relation to this particular branch of business: partly it continues a day of religious rest, and perhaps more largely than either, it is a day of general relaxation and amusement. While the day is in this undefined state, a state of transition, and parties in their business transactions claim the rights and immunities belonging to either phase of the day, it is not easy to determine what rule ought to be applied. As the day was formerly regarded and observed, there need be little hesitation in saying that it was not a suitable and proper time for requiring merchants to receive their goods on the wharves; and in the manner in which our great national festival is now observed, I think there would be as little difficulty. But in the equivocal position, which the day now holds between a working day, a day of general relaxation and amusement, and a day of religious rest, it may be questionable whether it is entitled to the full privileges of either. After some reflection, it appears to me that there is one way of extrication from the embarrassment so far as it is involved in these cases.

The consideration of the character of the day, for the present purpose, is narrowed down to the particular business of discharging vessels. Now it is proved by a weight of evidence entirely irresistible, that, by the custom of this port, if the unlivery has been begun, and a fast intervenes before it is finished, the work is continued that day. Especially when the discharge has been interrupted by the neglect of the consignee to take away the goods, the practice is universal; and this custom either was or might have been known by the consignees. When the obstruction on the wharf was removed, the master was justified in recommencing the discharge without any new notice to the consignees. This custom is so universal in this port, that I think merchants must be held bound to know it. If for any reason a consignee is unable or unwilling to receive his goods, he is, in my opinion, bound to give the master notice; and if he does not, the master may well conclude that he has no objection; and a discharge on that day will relieve him as a carrier, as it would on any working day.

What would have been the effect if such notice had been given, need not be considered in these cases. What the decision should have been if the unlivery had not been begun before the fast, is another question equally out of these cases, and I have no desire to make this decision broader than is required to cover the facts. At the first view, it may seem that a distinction might be made between the case of the Salmon Falls factory and the others. Their cotton was to be delivered at the railroad depot, which was closed, and the agents of the company could not receive and store it. But as he must be held cognizant of the custom, he might have given the master notice and had whatever benefit would be derived from that; and I think there is no sound principle upon which this case can be distinguished from the others. The conclusion is, that the libels must all be dismissed with cost. Having come to this conclusion on the general principles of the law, it becomes unnecessary to express any opinion as to the effect of the statutes.

The decision of the district court was reversed by the circuit court [Cases Nos. 5,494 and

12,265], but on appeal to the supreme court the decision of the circuit court [Case No. 5,494] was reversed and that of the district court affirmed. [Richardson v. Goddard] 23 How. [64 U. S.] 28.

[NOTE. The decision above in the case of Salmon Falls Manuf'g Co. v. The Tangier was reversed by the circuit court in Case No. 12,-265. In the case of Goddard v. The Tangier this decision was reversed in a separate opinion. Case No. 5,494. From the decision of the circuit court in this last case an appeal was taken to the supreme court, which reversed in turn the circuit court as above noted. Meanwhile, in the case of Salmon Falls Manuf'g Co. v. The Tangier, the circuit court, after the decision of the Goddard Case in the supreme court, granted a rehearing. At the new hearing the court reversed its opinion rendered in Case No. 12,265, and entered a decree affirming the decree of the district court. Case No. 12,266.]