## Case No. 12,266.

SALMON FALLS MANUF'G CO. v. The TANGIER.

[1 Cliff. 396.] [1]

Circuit Court, D. Massachusetts. May Term, 1860.

SHIPPING — CARRIERS OF GOODS — DELIVERY — NOTICE—DISCHARGE—NOTICE AFTER DISCHARGE —INTERRUPTED WORK—NEW NOTICE.

1. When a carrier by water, acting pursuant to a full and reasonable notice to the consignee of the arrival of the vessel and of his readiness to deliver the cargo, unlades the same on a suitable wharf at a suitable time, and makes it ready for delivery, as by separating each consignment from the others, and placing them where they are conveniently accessible for the purpose of removal, such acts, if performed in good faith, have the effect to discharge the carrier from further liability as carrier, and entitle him to freight.

[Cited in Richmond v. Union Steamboat Co., 87 N. Y. 247. Cited in brief in Hamburg-American Packet Co. v. Gattman, 127 Ill. 606, 20 N. E. 662.]

2. Notice of the arrival of the vessel, and readiness to deliver, need not be delayed till the cargo is unladed and all the acts performed which are requisite to discharge the carrier; it is more usual to give the notice when discharging is commenced; and when so given, it is not in general necessary that it should be repeated, if unloading is prosecuted without unnecessary or unusual delay.

3. When no notice is given to the consignee until the cargo is discharged, it seems the responsibility of the carrier continues until a reasonable time in which to remove the goods, has elapsed; but such is certainly not the rule where notice is given prior to the unlading.

[Cited in The Boskenna Bay, 22 Fed. 665.]

[Cited in Faulkner v. Hart, 82 N. Y. 417; McAndrew v. Whitlock, 52 N. Y. 48; McNeal v. Braun, 53 N. J. Law, 624, 23 Atl. 687.]

4. If the unlading be temporarily interrupted by the crowded state of the wharf, on account of other consignees not removing their goods, no new notice need be given on resumption of the work.

5. Where prior notice is given, it is the duty of the consignee and carrier to co-operate, and the one who fails so to do must abide the consequences.

This was an appeal in admiralty in a case of contract. It appeared from the testimony, that, on the 3d of March, 1856, the Tangier took on board as part of her cargo of cotton one hundred bales, consigned to John Aiken, treasurer of the libellants, and sailed for Boston. She arrived April 6th. The next day, at the request of the principal consignee, she hauled up to Lewis Wharf, and the master gave to the principal consignees the usual notice of arrival and readiness to deliver cargo. The agent of the libellants, on receipt of this notice, instructed the truckman who usually did such work for them to take their cotton from the wharf and deliver it to the railroad company, to be carried to their mills, and furnished him with receipts to be signed by the agent of the railroad company, as the cotton came into their hands. On the 7th, the master began to discharge the cotton upon the wharf, causing the lots of the several consignees to be separated and so placed as to be easily accessible. This unloading continued till one o'clock on the 8th, when the wharf became so crowed that the work had to be suspended. At that time thirty-seven bales of the libellants' cotton had been discharged, and thirty-five bales had been received by their truckman. On the morning of the 9th the truckman of the libellants went to the wharf, and, finding none of libellants' cotton, did not return on that day, or on the 10th,

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

which was fast-day. The wharf having been sufficiently cleared on the morning of the 10th for the master of the vessel to resume work, he accordingly proceeded with the unloading, without giving any new notice of the time of recommencing to unlade. At one o'clock p. m. of that day the remainder of the cargo, including the sixty-five bales of the libellants, was on the wharf, properly sorted, and so placed that each consignee's portion was easily accessible. At two o'clock an accidental fire consumed all the cotton on the wharf. In the district court a decree was entered dismissing the libel [Case No. 12,267], whereupon the libellants appealed to the circuit court [see note, Id. 12,267].

C. B. Goodrich, for appellants.

As the claimants [Charles Richardson and others] rely upon a constructive delivery, the burden of proof is on them to show it. To do this they must show that an actual delivery was prevented by some neglect or default of the party entitled to receive the goods. Pars. Mar. Law, 202. An unlading and putting of the cotton on a wharf at a proper time and place is not eo instanti a delivery to the consignee; he is entitled to a reasonable time to examine and to receive his goods. Fland. Shipp. §§ 276, 279; Syeds v. Hay, 4 Term R. 260; Gatliffe v. Bourne, 4 Bing. (N. C.) 314; Bourne v. Gatliffe, 3 Man. & G. 687; Goold v. Chapin, 10 Barb. 613; Clendaniel v. Tuckerman, 17 Barb. 189; Brittan v. Barnaby, 21 How. [62 U. S.] 529. The inability and neglect of the master to deliver on the 8th, and again on the 9th, was a refusal to deliver. Notice of intention to deliver is of no avail, unless followed by an actual readiness to deliver at the time appointed. After delivery had been stopped, a readiness to resume delivery is unavailing, without a new notice. 1 Leigh, N. P. 515; The Grafton [Case No. 5,-655]; Stevens v. Boston & M. R. R., 1 Gray, 277; Bradstreet v. Baldwin, 11 Mass. 232; Dobson v. Droop, 1 Moody & M. 441; Abb. Shipp. 421. One o'clock p. m. was the dinner-hour of the truckmen employed to move the goods. An unloading of the goods at that hour, without notice, and after an inability and refusal on two prior days, was not a delivery. The destruction by fire does not discharge the carrier, for the fire was not on board the vessel, and the bill of lading contains no exception on account of fire. 9 Stat. 635; Morewood v. Pollok, 18 Eng. Law & Eq. 341; Atkinson v. Ritchie, 10 East, 533.

Shepley & Dana, for claimants.

The unloading of goods on a suitable wharf at a usual time for unlading after reasonable notice to the consignee, accompanied with a readiness and present ability to deliver, is such a tender of delivery as discharges the ship-owner from his liability as a carrier. Norway Plains Co. v. Boston & M. R. Co., 1 Gray, 271; Cope v. Cordova, 1 Rawle, 203; Hyde v. Trent & M. Nav. Co., 5 Term R. 389;

Goold v. Chapin, 10 Barb. 613; Fisk v. Newton, 1 Denio, 45; Ang. Carr. § 313. This rule of law is founded on the excellent reason that the liability of the carrier ceases when and where the duty to carry ceases, and the ship-owner never carries beyond the wharf. The only question, then, is the question of fact,—was there a landing on the wharf, usual or assented to, of the libellants' cotton, separately or accessibly placed, under notice, before it was burned? The evidence places the answer to this question beyond dispute. As for the new notice, which it is said ought to have been given on resumption of work, on the 10th, no authority can be cited which requires it, and no custom which demands it. The last objection, that the time when the unloading was finished was the dinner-hour of the truckmen, can apply only to the few bales last unloaded, if to any. In fact, this cargo was discharged in the daytime at the usual hours, and this is sufficient.

CLIFFORD, Circuit Justice. Beyond question, the decision of the supreme court in Richardson v. Goddard, 23 How. [64 U. S.] 28, has established the rule that a vessel lying in an American port, if she has commenced to discharge her cargo prior to the occurrence of the annual fast of the state in whose port she is at the time moored, may properly continue the work on that day, or in case the work of discharging the vessel had been suspended because the wharf was temporarily blocked up by the merchandise previously unladen she may, if the obstacles are removed, resume and complete the work on that day as an ordinary working-day. Assuming that the day when the unlading was completed must now be considered, under the circumstances of this case, as an ordinary working-day, the counsel of the respondents insists that the evidence disclosed in the record fully establishes their defence. That proposition is denied by the libellants, and they insist that the present case is distinguishable from that decided by the supreme court in two particulars. First, they contend that there should have been a new notice to them prior to the resumption of the unlading on fast-day, after it had been suspended by reason of the blocking up of the wharf, and that no such new notice was given. Second, it is insisted by the libellants, that as the work of unlading was not completed until one o'clock, and, as that was the usual dinner-hour of the truckmen, the unlading was not at a proper time so as to discharge the carrier from further liability, even if the notice was sufficient, and although all the other acts to constitute a legal substitute for an actual delivery were duly performed.

That due notice was given of the arrival of the bark, and that the master was ready to deliver the consignment, has already appeared, and the evidence upon that point need not be repeated. No authority is cited

to show that a second notice is ever required in a case like the present, and it is believed that none can be found to countenance such a requirement, where it appears, as in this case, that all of the officers of the vessel remained on board, and that the suspension of the work was only a temporary one, occasioned by the ordinary impediments and obstructions universally known to be incident to the nature of the business. Small wharves are liable to become blocked up upon the discharge of large cargoes, and when that is the case the obstruction itself furnishes to the experienced truckman or drayman the reason for the suspension of the work. Had the master truckman of the libellants gone to the wharf on Wednesday and found the vessel abandoned by her officers, and no one on the wharf engaged in removing the cotton, there would be much greater reason to support the views of the libellants; but it was not so. When the teamster went there, all of the officers were on board, and the truckmen of the delinquent consignees were employed in removing the cotton from the wharf, and some two hundred bales were removed during that day. Under these circumstances, the teamster could hardly fail to understand that the work of unlading would be resumed as soon as the obstacles which had caused it to be suspended were removed. Besides, while he was there he was told by the mate that want of room had occasioned the work to be suspended; and not a doubt is entertained from the evidence that he well understood that it would be resumed as soon as a sufficient number of bales were taken away to afford room to discharge the residue. Carriers by water, acting under the usual bill of lading, are not required to transport their cargoes from the wharf to the storehouses of the merchant or consignee, but may lawfully unlade the same at the usual wharf; and all the decided cases, if rightly understood, admit that if the carrier, acting pursuant to a full and reasonable notice to the consignee of the arrival of the vessel, and of his readiness to deliver the cargo, unlade the same on a suitable wharf, at a suitable time, and make it ready for delivery, as by separating each consignment from the others and placing it on the wharf, where it is conveniently accessible for the purposes of removal, that such acts if performed in good faith are equivalent to an actual delivery of the merchandise, and have the effect to discharge the carrier from all further liability in his capacity as carrier, and fully entitle him to the stipulated freight. Ships trading from one port to another have not the means of carrying the goods on land, and, according to the established course of trade, a delivery on a suitable wharf, at a suitable time, after due notice of the arrival of the vessel, and of the master's readiness to deliver the goods, is equivalent to such a delivery as will discharge the carrier from his liability as such, provided the consignment in question is properly separated from others, and the goods so placed on the wharf as to be conveniently accessible for the purpose of removal. Hyde v. Trent & M. Nav. Co., 5 Term R. 389; Story, Bailm. § 445; 2 Kent, Comm. (9th Ed.) 816; Cope v. Cordova, 1 Rawle, 203; Kohn v. Packard, 3 La. 225; Harman v. Mant, 4 Camp. 161; Goold v. Chapin, 10 Barb. 612; Ang. Carr. § 313; Norway Plains Co. v. Boston & M. R. Co., 1 Gray. 271; Fisk v. Newton, 1 Denio, 45; Thomas v. Boston & P. R. Co., 10 Metc. [Mass.] 472; Carside v. Proprietors of Trent & M. Nav. Co., 4 Term R. 581; Richardson v. Goddard, 23 How. [64 U. S.] 28. Mr. Chitty says, where goods arrive by ship from a foreign country, they must be delivered by the master to the consignee or his assigns according to the bill of lading, or at the usual wharf, according to the usages of the port of delivery with respect to such a voyage. Chit. & T. Carr. (Ed. 1857) 154; Golden v. Manning, 3 Wils. 429, 2 W. Bl. 916. He cannot, however, at once discharge himself from all responsibility by immediately landing the goods, without any notice of the arrival of the vessel or of his readiness to make the delivery. But he must give such reasonable notice of those facts to the merchant or consignee as will enable him, in the usual course of business, to receive and take away the goods. Add. Cont. (2d Am. Ed.) 480; Gatliffe v. Bourne, 4 Bing. N. C. 314; Bourne v. Gatliff, 11 Clark & F. 45; Price v. Powell, 3 Comst. [3 N. Y.] 326. It is a mistake, however, to suppose that such notice cannot be given till after the unlading is completed and all the acts performed which are required to discharge the carrier. On the contrary, it is more usual and equally effectual to give the notice at the time the work of discharging the vessel is commenced; and when so given it is not in general necessary that it should be repeated, provided the unlading is prosecuted without unnecessary or unusual delay. Casual interruptions in the prosecution of the work for brief periods, by such impediments and obstructions as are necessarily incident to the nature of the business,—as by the blocking up of a small wharf by the vessel's own cargo,—are not unusual, and do not create any necessity whatever for a second notice. Such impediments are so common that they may be said to furnish their own explanations, and being such as every truckman fit to be employed readily comprehends, the interruptions in the work of lading occasioned thereby create no necessity to repeat the notice, because the interruptions are not of a character to mislead those who are usually employed to remove the goods from the wharf.

Unlivery at a proper time as well as at a proper place is a part of the duty of the carrier, and is one of the necessary acts to be performed by him in order to discharge himself from liability in a case like the present. Where no actual delivery to the consignee had been made to free himself from responsibility

as a carrier, he must show that he gave due and reasonable notice of the arrival of the vessel and of his readiness to deliver the goods; that pursuant to that notice he discharged the consignment in question on a suitable wharf, at a suitable time, and that the goods were properly separated and so placed on the wharf as to be conveniently accessible for the purpose of removal. All this was done in this case, unless it be held, as is contended by the libellants, that the time was unsuitable, because the work was completed at one o'clock, which it is said is the usual dinner-hour at this port for the truckmen. Masters of vessels employed in the transportation of merchandise necessarily have to deliver goods to persons of different habits, and to those engaged in different pursuits; and to hold that they must suspend the work of discharging their vessels during the several hours when it is usual for those to whom the goods are to be delivered to go to their meals, would be to subject them to great inconvenience and embarrassment. Such restriction upon the hours of labor would prove to be very inconvenient to those usually employed to discharge the cargo, and still more so to those belonging to the vessel. Meal-time, as usually understood by different persons in a commercial port, is exceedingly variable. Dinner-hour, varies from twelve o'clock at noon to six o'clock in the afternoon and breakfast-hour from sunrise to ten o'clock in the forenoon, or later. Take the case of a large cargo consigned to various consignees, and if indiscriminately stowed, it would be difficult to discharge it at all within the business hours of the day, without violating this supposed rule. Truckmen, it is said, usually dine in this port at one o'clock, but the case shows that some of them dine at twelve, and, what is more, the case also shows that other persons besides regular truckmen were employed in taking away some portion of the cotton. Consignees are not obliged to employ truckmen to remove their goods from the wharf, but may go there in person if they choose, and receive their own consignments; and if the rule has any foundation in law, it is very clear that its benefits may be claimed by all who have any such dealings with the vessel. But the objections to the proposition as applied to this case do not consist alone in the uncertainty of the restriction as to the hours of labor, nor even in the fact that the rule would occasion great inconvenience and embarrassment. Still graver objections exist to it, arising from the assumed theory of law on which it is

based. It assumes, in the first place, that the notice given by the master of the arrival of the vessel, and of his readiness to deliver the goods, imposed no duty upon the consignees until all the acts required of the master to discharge himself from his responsibility as a carrier had been performed; and then it also assumes, in the second place, that, after all those acts had been performed, he still continued to be the insurer of the goods for such a length of time as was reasonably necessary to enable the consignee to go to the wharf and take the cotton away. Suppose no notice had been given of the arrival of the vessel, and of the master's readiness to deliver the goods, as in the case of Gatliffe v. Bourne, 4 Bing. N. C. 314, then the theory of law assumed by the libellants, that the mere unlading of the goods on a suitable wharf, at a suitable time, is not equivalent to an actual delivery would be correct. When the only notice given of the arrival of the vessel, and of the master's readiness to deliver the goods, is subsequent to the performance of those acts, then it may be true that the consignee is entitled to a reasonable time thereafter in which to go or send to the wharf, receive the goods, and take them away. But where he is duly notified in advance of the unlading, or at the time when it was commenced, he has no right to remain passive and indifferent until the unlading is completed, and all the other acts required of the master are fully performed, and then claim that the liability of the carrier shall continue for such an additional length of time as will enable him to do what he ought to have done while the cargo was being discharged and those other acts were being performed. Consignees and masters of vessels are expected to co-operate in the delivery of consignments; and if they do so, it will seldom happen that any controversy will arise, and when they do not do so, the delinquent party must abide the consequences. The Grafton [Case No. 5,655]; Brittan v. Barnaby, 21 How. [62 U. S.] 529. Such co-operation is for the interest of both parties, and it is for that reason that it is required. Masters need the co-operation of consignees to prevent the wharf from becoming blocked up, and the interest of consignees is promoted by such co-operation, because without it some of the acts otherwise required of the master cannot be performed. A new hearing was granted in this case at the last term, so that the case now stands the same as in an ordinary appeal. For the reasons already given, the decree of the district court is affirmed.