JOSEPH GREGG

*v.*

THE ILLINOIS CENTRAL RAILROAD COMPANY.

*Filed at Ottawa October 26, 1893.*

1. COMMON CARRIER — *liability — when it ceases.* The liability of a railroad company as a common carrier of freight ceases upon the unloading of the goods from the car at the place of destination, and placing them in a safe and secure warehouse.

2. Where the carrier is not required, in the usual course of business, or expected, to remove the freight from the car, as in the case of grain in bulk, coal, lumber and the like, its liability as such will terminate by delivering the car in a safe and convenient position for unloading, at the elevator, warehouse or other place designated by the contract or required in the usual course of business, or, if no place of delivery is thus designated or required, on its side-track in the usual and customary place for unloading by consignees.

3. SAME—*liability—failure to designate place of delivery.* In the event of a failure of the consignee to designate a place of delivery, the contract of carriage will determine when the cars, in proper and safe condition, are placed at the usual and ordinary place of keeping or storing cars containing like freight upon the railroad company's tracks, and where they may be safely and conveniently unloaded.

4. Where several carloads of corn are shipped to a point named, consigned to the shipper, and no warehouse or place of delivery is designated, and it is not shown that in the usual course of business the carrier is bound to deliver at any particular place, it will be presumed that the consignee is to receive the grain on the track.

5. In all such cases, the question to be determined is, whether anything remains to be done by the carrier in the completion of its contract to safely carry and deliver the goods at the place of destination. If there is, its liability as carrier continues; if there is not, and the goods remain in the possession of the carrier, its liability in respect thereof, when not varied by contract or usage, is as a warehouseman, only.

6. Where the consignee of several carloads of corn, after notice of the arrival of the grain, fails to receive the same or designate any place of delivery, the carrier may not abandon the grain, but it will be required to exercise ordinary and reasonable care for its preservation, as warehouseman. In the exercise of such care the carrier may leave it

in the cars or store it in its own warehouse, assuming the liability of bailee or warehouseman therefor.

7. In such case the carrier may, with the exercise of like degree of care in selecting a responsible and safe depository, store the grain in an elevator or warehouse at the expense and risk of the owner, and thereby discharge itself from further liability. If the grain is stored in a safe warehouse, the carrier will not be held liable for the injury of the same by an unprecedented flood, which could not have been anticipated or guarded against. But even if the injury is the result of negligence on the part of the warehouseman, the carrier will not be liable therefor.

8. SAME—*failure to notify shipper of neglect of his agent to receive grain.* Where the owner of a lot of corn ships the same to himself, with directions to the carrier to notify the shipper's agent of the arrival of the grain, the failure of the carrier to give the shipper notice of the neglect of his agent to receive and take care of the same will not render the carrier liable, when such failure does not operate to the injury of the shipper.

9. SAME—*lien for charges.* A common carrier has a lien upon the goods transported, for its charges, while it retains dominion and control of the same. As between the lienor and general owner a lien can exist only while the lienor retains possession of the property. If he delivers possession, the lien is gone.

10. A railway company, as a common carrier of freight, such as corn in bulk, is not required to keep the same in its cars and upon its side-tracks for an indefinite time, to the detriment of its other business. The law imposes no such duty. If the railway company has a lien on the grain for carriage, it may store the same in its own name, and thus retain its lien.

11. Where a terminal railway company deposits the freight with a warehouseman, at the place of destination, in its own name, it will thereby preserve its lien on the goods for its advances and charges, and the warehouseman will hold the property for the benefit of both the carrier and the owner.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. S. P. McCONNELL, Judge, presiding. ·

On the 25th of July, 1888, appellant shipped by appellee's road two carloads of corn in bulk, from Lodi, Illinois, and on July 28, 1888, three carloads from Ludlow, Illinois, consigned, "Order Jos. Gregg & Co., Augusta, Georgia," with

directions to "notify Dunbar & Co." The record shows that the five carloads of corn reached Augusta during the period from August 2 to August 11, 1888, over the Georgia railroad, the terminal connecting line of railway over which the corn was transported. The bills of lading were attached to drafts, at ten days' sight, on Dunbar & Co., which were discounted by appellant in Chicago. On the 11th day of August, 1888, Dunbar & Co. wrote appellant as follows:

"AUGUSTA, GA., *Aug. 11, 1888.*

"*Messrs. Gregg, Garvey & Co., Chicago, Ill.*

"DEAR SIRS—Enclosed please find certificate of weight of cars No. 11,724 and No. 3038, for which you asked, and also for car 2500 I. C., which loses heavily. No demand for grain to-day, market is so stocked. A large lot of stuff was brought here prior to the advance in freight, and this being our tightest money season anyway, everybody has been cramped to pay for it. Our banks protected drafts, and loaned on until they, too, became cramped, and refused to lend any more. The situation is worse than last season, when you remember the same thing occurred. The best way we can see out of the difficulty in meeting your drafts, which begin to mature next week, is to draw back on you for them as they mature, and then let you make new ten day drafts on us, and in this way we can gain about fifteen or sixteen days, and in that time hope to place a great part of it. We can arrange to take care of the stuff itself without having to keep on track. We will begin to draw on Monday. We await your favors.

"Yours truly,    DUNBAR & Co."

This suggestion was followed, Dunbar & Co. drawing upon appellant to meet the drafts of appellant upon them, as they matured, and attaching the bills of lading issued to appellant, and originally attached to his drafts, as collateral to the drafts thus drawn by Dunbar & Co. upon appellant. These drafts were paid by appellant in Chicago, and other drafts, at ten

days' sight, with the bills of lading attached, were drawn on Dunbar & Co.   Dunbar & Co. were notified upon the arrival of the grain, and requested its storage with them, they being warehousemen and brokers at Augusta, Ga.   The corn not having been taken by the consignee, the Georgia railroad finally stored the same in Dunbar & Co.'s warehouse, taking their warehouse receipts to the Georgia Railroad Company, the last receipt being dated August 23, 1888.   On September 10, 1888, there occurred an extraordinary and unusual flood, which submerged the corn in the warehouse and damaged it. Dunbar & Co. sold $1386 worth of the damaged corn, the balance proving a total loss.   This suit is brought to recover the value of the corn lost and damaged.

Messrs. OTIS & GRAVES, for the appellant:

Where a car of grain is shipped in bulk, the duty of the carrier is not discharged and the delivery not complete until the car is placed at the point of destination, in a position where it can be unloaded into an elevator, when there is one. *Indianapolis Mills* v. *Railroad Co.* 72 Iowa, 535; *Francis* v. *Railroad Co.* 25 id. 61; *Mohr* v. *Railway Co.* 40 id. 579; *Porter* v. *Railroad Co.* 20 Ill. 408; *Merchants' Dispatch Co.* v. *Hallock*, 64 id. 284.

Where a carrier exercises the right to store unclaimed goods in a warehouse, they must be placed in care of competent and careful servants, able to respond for damages if loss should occur for which they are liable.   Story on Bailments, sec. 491; *Porter* v. *Railroad Co.* 20 Ill. 408; *Cahn* v. *Railroad Co.* 71 id. 96.

The directions indorsed on the bills of lading to "notify Dunbar & Co." did not make them consignees of the grain, or authorize the appellee to deliver the grain sued for to Dunbar & Co., without production of the bill of lading.   *Furman* v. *Railroad Co.* 106 N. Y. 579; *Railroad Co.* v. *Bank*, 123 U. S. 727; "*The Thames*," 17 Wall. 98.

As to the place where delivery is to be made, and custom and usage in that respect, see *Railroad Co.* v. *Ludden*, 3 Am. Ry. and Corp. Cases, 46; *Cahn* v. *Railroad Co.* 71 Ill. 96; *Dixon* v. *Dunham*, 14 id. 324; Angell on Carriers, sec. 301; *Turner* v. *Dawson*, 50 Ill. 85.

To exempt a carrier from liability for injury happening to goods while he is engaged in transporting them for hire, he must show that he was free from fault or negligence at the time the injury occurred. *Michaels* v. *Railroad Co.* 30 N. Y. 564; *Railroad Co.* v. *Curtis*, 80 Ill. 324; *Railway Co.* v. *Felder*, 46 Ga. 433.

In any event, the appellee was liable for the value of the grain, less the amount of damages which it necessarily received by reason of the flood. The proof shows that the grain could have been dried after the flood subsided, and sold at a loss of not to exceed from three to ten cents per bushel. Hutchinson on Carriers, secs. 320, 201; *Railroad Co.* v. *Hamilton*, 76 Ill. 393; *Railroad Co.* v. *Flannegan*, 23 Ill. App. 489; *Notara* v. *Henderson*, L. R. 5 Q. B. 346.

When a carrier receives goods marked to a particular place, it will be liable for the acts of the immediate carrier, and must see to this delivery at the place of their final destination. *Railroad Co.* v. *Frankenberg*, 54 Ill. 88; *Railway Co.* v. *Packet Co.* 70 id. 217; *Railway Co.* v. *Wilcox*, 84 id. 239; *Railway Co.* v. *Jaggerman*, 115 id. 407.

Mr. C. V. GWIN, for the appellee:

The liability of a common carrier, as such carrier, ceases on the arrival of the goods at the place of destination, and the storage of the goods in a safe warehouse. *Merchant's Dispatch Co.* v. *Hallock*, 64 Ill. 284; *Railroad Co.* v. *Friend*, id. 303; *Railroad Co.* v. *Mitchell*, 68 id. 471; *Rothschild* v. *Railroad Co.* 69 id. 164; *Cahn* v. *Railroad Co.* 71 id. 96; *Merchant's Dispatch* v. *Moore*, 88 id. 136.

A carrier by rail is under no duty to give notice to the consignee or owner on the arrival of the goods at the point of destination. (*Railroad Co.* v. *Scott*, 42 Ill. 139.) Even if such duty existed, then, in fact, both Dunbar & Co. and Gregg & Co. had notice, and entered into correspondence and negotiations concerning the corn.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The principal question presented is, whether the relation of appellee to the corn shipped by appellant was that of common carrier, at the time it was damaged. It is suggested, rather than argued, that appellee, as the initial carrier, limited, by contract, its liability for damages to such as might occur while carrying upon its own lines of road, and that it is not, therefore, liable for the conduct of connecting lines over which the freight was carried to its destination. In the view we take of the case it is unnecessary to discuss or determine this question. (See *Illinois Central Railroad Co.* v. *Frankenberg*, 54 Ill. 88; *Chicago and Northwestern Railway Co.* v. *Northern Line Packet Co.* 70 id. 217; *Erie Railway Co.* v. *Wilcox*, 84 id. 239; *Wabash, St. Louis and Pacific Railway Co.* v. *Jaggerman*, 115 id. 407.) Conceding the liability of appellee for the acts and misfeasance of connecting lines, we are of opinion the relation of common carrier had ceased before injury to the property occurred.

The law is well settled in this State that the liability of a railroad company, as a common carrier of freight, ceases upon the unloading of the goods from the car at the place of destination, and placing them in a safe and secure warehouse, or, where the carrier is not required in the usual course of business, or expected, to remove the freight from the car, as in the case of grain in bulk, coal, lumber and the like, by delivering the car in a safe and convenient position for unloading, at the elevator, warehouse or other place designated

by the contract or required in the usual course of business,. or, if no place of delivery is thus designated or required, on its side-track, in the usual and customary place for unloading by consignees. *Porter* v. *Chicago and Rock Island Railroad Co.* 20 Ill. 407; *Illinois Central Railway Co.* v. *Alexander*, id. 23; *Richards* v. *M. S. and N. I. Railway Co.* id. 404; *Chicago and Alton Railroad Co.* v. *Scott*, 42 id. 132; *Merchants' Dispatch Co.* v. *Hallock*, 64 id. 284; *Illinois Central Railway Co.* v. *Mitchell*, 68 id. 471; *Chicago and Northwestern Railway Co.* v. *Bensley*, 69 id. 630; *Cahn* v. *Michigan Central Railway Co.* 71 id. 96; *Merchants' Dispatch Co.* v. *Moore*, 88 id. 136; *Pittsburg, Chicago and St. Louis Railway Co.* v. *Nash*, 43 Ind. 423; *Southwestern Railway Co.* v. *Felder*, 46 Ga. 433.

In the case at bar, upon the arrival of the corn at its destination, there being no designated warehouse or place of delivery, and it not being shown that in the usual course of business the carrier was bound to deliver at any particular place, it is to be presumed that the consignee was to receive the same on track, and in the event of a failure of the consignee to designate a place of delivery, the contract of carriage would determine when the cars, in proper and safe condition, were placed at the usual and ordinary place of keeping or storing cars containing like freight, upon the railroad company's tracks, and where they could be safely and conveniently unloaded. In all such cases the question to be determined is, whether anything remains to be done by the carrier in completion of its contract to safely carry and deliver the goods at the place of destination. If there is, its liability as carrier continues; if there is not, and the goods remain in possession of the carrier, its liability in respect thereof, when not varied by contract or usage, is as warehouseman, only. *Chicago and Rock Island Railroad Co.* v. *Warren*, 16 Ill. 502; *Peoria and Pekin Union Railway Co.* v. *United States Rolling Stock Co.* 136 id. 643; *Connecting Railway Co.* v. *Wabash, St. Louis and Pacific Railway Co.* 123 id. 594; *Missouri Pacific Railway Co.*

v. *Chicago and Alton Railroad Co.* 25 Fed. Rep. 317; *Independence Mills Co.* v. *Burlington, Cedar Rapids and Northern Railway Co.* 72 Iowa, 535; *Goold* v. *Chapin*, 10 Barb. 612; Angell on Carriers, 291; Hutchinson on Carriers, sec. 356.

This freight was consigned by appellant to his own order, to Augusta, Ga., with instructions to the carrier to "notify Dunbar & Co." There is no pretence that the grain was not properly carried, in good order, to its destination, and was there in proper position for delivery to the consignee in apt time, or that notice was not given to Dunbar & Co. promptly upon the arrival of the freight. The carrier had completed its contract of carriage, and obeyed the instructions of the consignor in giving notice, in apt time, of the arrival of the grain at destination. It is not shown when the various consignments of corn arrived in Augusta, but it is clear that one of the cars—2500 I. C.—had reached its destination before the 11th of August, 1888, and it is also apparent that all five of the cars, containing the corn sued for, arrived before the 23d of August, 1888, but how long prior to these dates the shipments were completed does not appear.

It is insisted, however, that the contract of carriage was not completed because notice of the failure of Dunbar & Co. to take the corn was not given to the consignor, and it is shown that the course of dealing was for appellee to notify appellant of the failure of the consignee, or person to be notified, to take the shipment, and it is insisted that appellant was justified in relying upon such notice being given, and that if notice had been given he could have cared for the corn by storing it or shipping it elsewhere, in which event the loss would not have occurred. We do not find it necessary to determine whether, under the course of dealing shown, appellee would be liable for failure to give such notice. The loss or injury to the corn occurred by the flood of September 10 following the arrival of the corn in Augusta, and, conceding that the flood was a cause for which the railroad company was not

responsible, it is said that the negligence of the railroad company in not giving such notice contributed immediately to the loss, and it is therefore liable.   This contention is without force, for the reason that it is affirmatively shown that appellant was notified by Dunbar & Co.   Dunbar & Co. were not entitled to receive the corn except upon payment of the drafts drawn against it, and production of the bills of lading. (*Indianapolis and St. Louis Railroad Co.* v. *Herndon et al.* 81 Ill. 143; *Joslyn* v. *Grand Trunk Railway Co.* 51 Vt. 92; *Pennsylvania Railway Co.* v. *Stern et al.* 119 Pa. St. 24; *Watson* v. *Hoosac Tunnel Line*, 13 Mo. App. 263; Wood on Railway Law, 1594.)   By the letter of Dunbar & Co., of August 11, as we have seen, appellant was notified of the arrival of at least one of the cars of corn in controversy, and that because of the condition of the market, Dunbar & Co. would be unable to meet the drafts drawn against the shipment.   Thereupon the brokers suggested, as will be seen, a plan by which the time could be extended fifteen or sixteen days, to enable Dunbar & Co. to sell the corn in Augusta.   It is clear, we think, from the language of this letter and the subsequent conduct of the parties, that this referred not only to the corn then on track, but to the shipments that were immediately to follow.   The suggestion was, that Dunbar & Co. would draw upon appellant, to cover the drafts of appellant upon them as they matured, accompanying their drafts by the original bills of lading as collateral; that Dunbar & Co. could arrange to take care of the corn without having to keep it on the railway track, and that they would commence drawing on the following Monday, and appellant could re-draw on Dunbar & Co. at ten days, etc.   Appellant accepted the proposition of Dunbar & Co., paid the drafts drawn by them, and re-drew at ten days, again discounting these drafts in Chicago.   The transaction shows that appellant knew that Dunbar & Co. were unable to realize upon the grain, and thereby pay the first drafts and take up the bills of lading, upon the presentation

of which, only, would they be entitled to receive the corn, and that the purpose of the arrangement entered into and carried out was to gain time to enable them to sell the corn at Augusta. Appellant was advised that within the fifteen or sixteen days thus to be gained, "we" (Dunbar & Co.) "hope to place a great part of it." He also was advised that Dunbar & Co. proposed to get the corn off the railroad track, and was told, "We can arrange to take care of the stuff itself without having to keep it on the track." The testimony of appellant shows that when his drafts for "this grain" matured, Dunbar & Co. paid them by making demand drafts back on appellant, with the original bills of lading attached, which he paid, and made new drafts at ten days, with the bills of lading attached, and that these latter were accepted by Dunbar & Co., but not paid.

We think no one can read this record without being convinced that it was understood by the parties that this arrangement, which appellant admits he accepted, related to all the corn now in controversy. It is manifest, not only that appellant knew that Dunbar & Co. had not received the corn, but that they were not entitled to receive it, and also that appellant voluntarily arranged to leave the corn under the control of Dunbar & Co., for sale at Augusta. It was clearly, we think, within the contemplation of the parties, that the corn was to be taken from the railroad track under an arrangement to be perfected by Dunbar & Co., and the corn to remain in Augusta to be sold by them. This was the sole purpose of the arrangement carried out, and it is clear, therefore, that if any duty existed on the part of the railroad companies to give notice of the failure of Dunbar & Co. to produce the bills of lading and claim the grain, their failure in nowise operated to the injury of appellant.

It is urged that the railway company was at fault in depositing the grain with Dunbar & Co., whose warehouse was submerged by the flood, when there were other elevators and warehouses at Augusta upon higher ground, and which were

not affected by the flood, in which the grain might have been stored. The question of whether it could have been thus stored may be said to be a controverted question of fact. But waiving that, and also, for the present, the question of whether Dunbar & Co. were not the agents of appellant to take care of and store the grain, the court was justified in holding, as it did, in effect, in its rulings upon the propositions offered, that the railroad company was not liable because of storing with Dunbar & Co. That the warehouse of Dunbar & Co. was a safe and secure place for storing the grain, except for the flood mentioned, is unquestioned. That the flood was unprecedented and extraordinary, both in the rapidity of its rise and extent, is clearly shown. Many of the witnesses had resided at Augusta from twenty-five to thirty years, and all testify that no flood endangering the warehouse or its contents had occurred within their knowledge. It appears from the evidence that business streets of the city were under water, stocks of goods destroyed, the railway company's tracks and depot submerged. It is apparent from the record that no foresight, however prudent and careful, could have anticipated damage to the corn from that source. The railroad company was not required to keep the corn in its cars on track indefinitely, and although the consignee was in default in not receiving the freight, after reasonable time and opportunity had been afforded in which to take it, the carrier could not abandon it, but was required to exercise ordinary and reasonable care for its preservation as warehouseman. In the exercise of such care it might leave it in the cars, store it in its own warehouse, assuming the liability of bailee or warehouseman therefor, or it might, with the exercise of like degree of care in selecting a responsible and safe depositary, store the grain in an elevator or warehouse at the expense and risk of the owner, and thereby discharge itself from further liability. *Illinois Central Railroad Co.* v. *Alexander*, 20 Ill. 23 ; *Richards* v. *M. S. and N. I. Railroad Co.* id. 404 ; *Porter* v. *Chicago and*

*Rock Island Railroad Co.* id. 407, (approved in *Davis* v. *M. S. and N. I. Railroad Co.* id. 412,) and other cases *supra; Clendaniel* v. *Tuckerman*, 17 Barb. 189 ; *Fish* v. *Newton*, 1 Denio, 45 ; *Gould* v. *Chapin, supra; Western Transportation Co.* v. *Barber*, 56 N. Y. 544; *Alabama and Tennessee Railroad Co.* v. *Kidd*, 35 Ala. 209 ; *Smith* v. *N. and L. Railway Co.* 7 Foster, 86 ; Hutchinson on Carriers, 488.

It is insisted, and a proposition was submitted presenting the contention, that Dunbar & Co. were the agents or warehousemen of the Georgia Railroad Company, and they having failed, as it is alleged, to use proper efforts to dry the corn after its having beeen submerged, that appellee is liable for the damages thus occasioned. It is shown that corn, after having been wet, and remaining under water three or four days, as this was, may be dried, and that it will sell in the market for something less than sound corn. This contention is based, principally, upon the fact that the Georgia Railroad Company took the receipts of Dunbar & Co., as warehousemen, to itself. Waiving the question, not made by counsel, as to the liability of the initial carrier for the conduct of the terminal connecting line after the carriage has ceased and the liability of warehouseman has attached, we are of opinion, upon the facts shown, there was no liability on the part of appellee for the negligence of Dunbar & Co., if any is shown, in the respect indicated. The grain was detained at Augusta by the consent of appellant, with the understanding that fifteen or sixteen days' time could be gained by the arrangement of drawing and re-drawing before mentioned, in which Dunbar & Co. might dispose of it. If, by such an arrangement, appellant, without the consent of appellee or the terminal line, could continue the liability of the Georgia Railroad Company as warehouseman for fifteen days, and compel it to keep the grain on track, and bind appellee as the initial carrier, it could do so for thirty, ninety or any number of days. The effect would be that railroad companies would be compelled to

retain their cars on track indefinitely, and their tracks become blocked with cars awaiting the convenience of consignees. There is no duty attaching to the common carrier of this character.

It seems to be well settled that the carrier has a lien upon the goods transported, for its charges, while it retains dominion and control of the same. The rule undoubtedly is, as between the lienor and general owner, that a lien can exist only while the lienor retains possession of the property. If he deliver possession, the lien is gone. *Skinner* v. *Upshaw,* 1 Ld. Raym. 752; *Sodergreen* v. *Flight,* 6 East, 662; *Forth* v. *Simpson,* 13 Q. B. 689; *Bigelow* v. *Heaton,* 4 Denio, 496; *McFarland* v. *Wheeler et al.* 26 Wend. 467; *Wingard* v. *Banning,* 39 Cal. 543; *Reineman* v. *C. C. and B. Railroad Co.* 51 Iowa, 338; Hutchinson on Carriers, sec. 479; 2 Parsons on Contracts, *207, note e. The terminal carrier, upon the default of the consignee to receive the grain, might have stored it in the warehouse of a responsible third person, in the name and for the benefit of the consignee alone. It is unnecessary to discuss, here, what would have been the effect of such storing, with notice to the warehouseman of the lien of the railroad company for its freight charges, or whether its lien could have been thus preserved. What the terminal railroad company did was to deposit it in its own name, thereby preserving its lien. The warehouseman held the property for the benefit of both the carrier and consignor,—for the carrier, for the purpose of preserving its lien. *Western Transportation Co.* v. *Barber, supra;* "*The Eddy,*" 5 Wall. 481; *Brittan* v. *Barnaby,* 21 How. 527; *Alden* v. *Carver,* 13 Iowa, 253.

The storing of the grain with Dunbar & Co. was for the benefit of the owner, subject only to the condition of his discharging the lien by paying the freight. This was, we think, the legal effect of this transaction. Dunbar & Co. had proposed to arrange for taking care of the corn, for the benefit and convenience of appellant, without leaving *it* on track.

The evidence shows that the railroad company claimed the right to charge one dollar per car for each twenty-four hours the car remained upon its track, unloaded, after the expiration of forty-eight hours after the arrival of the car at destination. Appellant, as he testifies, accepted the proposition of Dunbar & Co., and, as we have seen, the parties acted upon it and carried it out. The evidence shows that Dunbar & Co. applied to the railroad company and proposed storage of the corn in their warehouse, and went to the trouble of sacking it to enable them to get it off track. What was done was in furtherance of the proposition made in appellant's interest by his broker, who, as between the railroad company and appellant, must, in respect of this transaction, be regarded as the agent of the latter. The railroad company was not bound to waive its lien for its charges, under the circumstances here shown, by an absolute delivery of the property, by depositing in the name and for the benefit of the consignee, but might rightfully preserve the same by arranging with Dunbar & Co. for its preservation, without subjecting itself to further liability as warehouseman. We think the effect of the arrangement was to constitute Dunbar & Co. warehouseman of appellant, who held the property for him, subject only to the lien for the carrier's charges.

We are of opinion that the trial court ruled correctly in refusing the various propositions submitted by appellant, and the judgment of the Appellate Court will accordingly be affirmed.

*Judgment affirmed.*