## J. S. Cardwell, Appellee, v. John Barton Payne, Director General of Railroads, et al., Appellants.

### Gen. No. 27,030.

1. CARRIERS—*evidence showing railroads' liability as warehousemen and not as carriers.* Railroads in whose cars hay was shipped are not chargeable as carriers for the damaged condition of such hay when it was examined at the destination, on a prima facie showing that the hay was in good condition when purchased in such cars in Chicago but was mouldy and damaged when examined at the point of delivery to the consignee some weeks later, where there is no evidence as to when the cars reached the destination, the inspection in question having been made some days later than the shipment would ordinarily have reached its destination, and it is not shown how long they stood on the tracks before the inspection was made. .

2. CARRIERS—*proof necessary to charge railroad as initial carrier on through shipment.* A railroad is not chargeable as the initial carrier, for damage to hay shipped in its cars, from Canada to Chicago and thence, under a diversion order, to Tennessee, where

the evidence tends to show that the shipment was treated as a through one to which a through rate applied and there is no evidence that defendant received the cars at the original points of shipment in Canada.

3. CARRIERS—*admissibility of evidence of applicability of through rate in action to charge as initial carrier.* In an action to charge a railroad as initial carrier with damage to freight carried in its cars, where there is evidence tending to show that the shipment was a through one originating at a point beyond defendant's lines, and that defendant was a forwarder only, it was error to refuse to permit the chief clerk of defendant to testify whether or not under the circumstances a through freight rate applied to the shipment.

4. CARRIERS—*when railroad liable as forwarder and not as initial carrier.* In an action against railroads for damages to hay shipped in cars of such roads, the defendants are not chargeable as initial carriers on the theory that the shipments originated in Chicago, where the evidence shows that the hay was loaded in the cars in Canada and shipped to Chicago, was there purchased on the tracks by plaintiff and under diversion orders was forwarded to Tennessee over another line to which the cars were switched by defendants, there being no evidence that defendants issued bills of lading for the movement from Chicago to Tennessee, such bills having been issued by the railroad to which the defendant delivered the shipment at Chicago.

5. EVIDENCE—*freight bills as evidence of quantity of freight damaged.* In an action against carriers for damage to hay, the paid freight bills received by plaintiff from the final carrier giving the weights of the hay in each car are admissible to prove the quantity of hay involved.

6. DAMAGES—*measure for damage to hay in transit in action against carriers.* In an action against railroads for damage to hay shipped from Chicago to Tennessee, where the damaged condition of the hay was not discovered until after it arrived at its destination and several days subsequent to the date on which it would ordinarily have arrived, there being no evidence of the date of arrival, or that it was in bad condition on that date, plaintiff is not entitled to prove the market value of hay in good condition on the date of discovery of the damage, but is required to show the values of good and damaged hay on the date of arrival or that the market value of hay in good condition was a staple figure not subject to change during the period between the probable arrival and the discovery of the damaged condition.

7. JUDGMENTS AND DECREES—*joint judgment against Director General of Railroads in action on separate contracts of carriage.* It is error to render a joint judgment against the Director General of

Railroads as the representative of two separate carriers for damages to two separate shipments of hay carried on separate contracts of carriage and not handled jointly at any time by the two railroads, since such action, although nominally brought against the Director General only, is in fact one against the separate railroads under the provisions of the Federal Control Act, sec. 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, par. 3115¾j), that "actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law," and the causes of action on the separate contracts of carriage are as separate and distinct as if they had arisen prior to federal control.

Appeal from the Municipal Court of Chicago; the Hon. JOSEPH S. LABUY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Reversed and remanded. Opinion filed October 18, 1922.

WINSTON, STRAWN & SHAW and KRETZINGER, KRETZINGER & SMITH, for appellants; L. L. SMITH and FRANK H. TOWNER, of counsel.

JOHN J. SHERLOCK, for appellee; W. C. KANE and FRANK T. HUENING, of counsel.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

Plaintiff brought this action of the first class in the municipal court of Chicago to recover damages alleged to have been sustained by him in connection with the shipment of seven cars of hay from Chicago to Nashville, Tennessee, in February and March, 1918. Summons was served on the Director General of Railroads operating the Michigan Central Railroad and also on the Director General of Railroads operating the Grand Trunk Western Lines Railroad, by service upon a representative of each road and separate appearances and affidavits of merits were filed by those defendants. The cause was heard before the court without a jury. At the conclusion of the plaintiff's evidence, both the defendants above

referred to moved the court to find the issues in their favor, which motions were denied, whereupon both defendants stood upon the motions so made and offered no evidence. The court then found the issues for the plaintiff and against the defendants and assessed the plaintiff's damages at the sum of $1,585.89. Motions for a new trial and in arrest of judgment being denied, judgment was entered for the plaintiff for the sum above named, to reverse which the appellants have perfected this appeal.

The plaintiff is a hay and grain shipper living at West End, Illinois. In February, 1919, he came to Chicago and purchased between fifty-five and sixty cars of hay from Albert Miller and Company, among which were the seven cars which are the subject of this action. It appears from the evidence submitted in behalf of the plaintiff that these cars came into Chicago consigned to Miller & Company, two of them over the Michigan Central and the other five over the Grand Trunk. The original points of shipment as to all seven cars were different points in Canada. When the plaintiff bought these cars of hay, they were standing on the team tracks of the respective railroads in Chicago. Upon the sale being made, Miller & Company delivered diversion orders on the seven cars, two to the Michigan Central and the other five to the Grand Trunk. The two diversion orders delivered to the Michigan Central were dated March 4, 1919. Of the five diversion orders delivered to the Grand Trunk, one was dated February 25, 1919, and the other four were dated March 4, 1919, and these four bore a stamp showing they were received by the Grand Trunk on March 5, 1919. All these orders directed the diversion of the cars to Nashville, Tennessee, some to Cardwell as consignee and others to the original consignee, Miller & Company, with request to notify Cardwell on arrival. Four of them contained a request to notify "B. & Co." The chief

clerk of the Michigan Central, testifying for the plaintiff, said that upon receipt of diversion orders such as these, they usually corrected the bill of lading and ordered the train department to move the cars. In the case of cars such as those involved here, he said they would be routed by the Illinois Central and Nashville, Chattanooga & St. Louis and that all the Director General of Railroads operating the Michigan Central would do would be to switch the cars to the Illinois Central.

The freight agent of the Grand Trunk, also testifying for the plaintiff, said that in cases involving cars such as those involved here, the usual and ordinary method of handling the cars after receipt of the diversion orders would be to make a switching bill to the Illinois Central; that they would then deliver the cars to the Illinois Central Railroad, which road would issue the bill of lading; that the diversion orders delivered to the Grand Trunk showed that the original bills of lading accompanied the orders in all but one case. He further testified that the through freight rate would apply on these cars from the original point of shipment to Nashville; that the Director General of Railroads operating the Grand Trunk hauled the cars from the frontier to Chicago and from Chicago he would have no part in the haul, except the movement to the Illinois Central.

The plaintiff testified that he examined the hay in each of the seven cars at the time he purchased it in Chicago; that he saw the hay on the top and the bottom, looked at it, felt of it, and smelled it; that it was not damp or wet, showed no stain nor mould and was dry and of good quality; that this examination was through the door of each car; that he looked at such hay as he could see from the door; that he could see in the neighborhood of 20 bales in the doors on each side; that there would be about 200 bales in each car; that some of these purchases were made about Feb-

ruary 25 or 26 and others on March 4 or 5; that the usual and ordinary time for the movement of hay from Chicago to Nashville was seven or eight to ten days; that he next saw the hay at Nashville about March 20, and it was then wet and mouldy and rotten; that all the cars were old and had bad, leaky roofs; that he made no examination of the cars in Chicago.

One Maremont, a hay salesman for Miller & Company, testified that when the hay was examined in Chicago it was not damaged or wet; that all they did was to look at the hay in the doorways of the cars. One McFarland, who lived at Benton, Illinois, testified he was with the plaintiff when the hay in question was purchased; that they opened both doors of the cars and examined the sides of the bales next to the open doors and found it dry and sound.

In our opinion, this evidence was sufficient to make out a prima facie showing to the effect that the hay was in good condition at the time it was purchased and in bad condition when examined at Nashville on March 20, but it would not follow that the damage was such as the Michigan Central and Grand Trunk Railroads would be liable for. There was no testimony as to when the hay arrived at Nashville. On the plaintiff's testimony as to the time usually taken for the movement of hay from Chicago to Nashville, it may have arrived on March 15, or earlier, but it was not examined until March 20. The liability of the railroads as common carriers terminated upon the delivery of the cars at the usual place for unloading at Nashville. *Gratiot St. Warehouse Co. v. St. Louis, A. & T. H. R. Co.,* 221 Ill. 418; *Gregg v. Illinois Cent. R. Co.,* 147 Ill. 550. Notice of such arrival to the consignee is not necessary to terminate such liability. *Illinois Cent. R. Co. v. Carter,* 165 Ill. 570. After such arrival the liability of the railroad is that of a warehouseman. *Gregg v. Illinois Cent. R. Co., supra.* In that case the

burden would be on the plaintiff to prove affirmatively that the damage was caused by the negligence of the defendants.

If it be assumed that the damage occurred prior to the time of delivery at the team track at Nashville, the Director General operating the Grand Trunk or the Michigan Central would not be liable in the absence of some showing to the effect that the damage was caused by the negligence of these railroads. They were not the initial carriers whether we consider the shipments as through shipments from Canadian points to Nashville or as shipments originating in Chicago. The evidence tends to show, at least as to the Grand Trunk cars, that the through freight rate applied from the original points of shipment to Nashville. In such event that carrier would not be considered the initial carrier unless it received the cars at the original points of shipment. That it did, is not proven by the evidence in the record. While the chief clerk for the Michigan Central was on the stand, on cross-examination, his attention was directed to a notation on the diversion orders covering the two cars in which that railroad was involved, which read, "Protect through rate," and he was asked whether, in case of such an order and action thereon by the Director General operating the Michigan Central and forwarding the cars, the directions would be observed. That question was objected to on the ground that this was an original shipment and the objection was sustained. The question was a proper one for if the through rate would be applied to the shipment it would tend to prove that the shipment was through shipment from the point of origin to Nashville.

But if we are to consider these shipments as originating at Chicago, as the plaintiff contends, the Michigan Central and the Grand Trunk were not the initial carriers as to such shipments. All they did was to switch the cars over to the Illinois Central

and deliver them to that railroad. In so doing they were acting as forwarders and not as carriers. *Gulf, C. & S. F. Ry. Co. v. Texas*, 204 U. S. 403; *Pere Marquette Ry. Co. v. J. F. French & Co.*, 254 U. S. 538, 542, 543. There is no proof in the record to the effect that the Michigan Central or the Grand Trunk ever issued bills of lading on any shipment covering these cars on a movement from Chicago to Nashville. The only bills of lading covering that movement were issued by the Illinois Central Railroad.

In connection with his proof of damages, the plaintiff established the quantity or weight of the hay involved by introducing in evidence, over the objections of the defendants, the paid freight bills received by him from the Nashville, Chattanooga and St. Louis Railway Company which gave the weights of the hay in each car. In our opinion that evidence was proper. But in proving the market value of hay in good condition in Nashville, as an element on which to base damages, the plaintiff proved that value on March 20, 1919, which was the day on which he first examined the damaged hay. As previously pointed out the hay may have arrived a week or more previous to that time. If the hay arrived in bad condition, the plaintiff's damages would be the difference between the market value of hay in good condition at that time and the value of the hay in its damaged condition. Plaintiff should have proven that the hay did arrive in the condition in which it was when he examined it on the 20th; the date of its arrival and the market value of hay in good condition on that date and the value of the hay in its damaged condition. If the market value of hay in good condition was a stable figure which was not subject to changes and was the same a week prior to the 20th as it was on that date, that fact should have been shown.

However, the most serious error in this record has to do with the misjoinder of the defendants and the

entering of a joint judgment against them. It is admitted that of the seven cars of hay involved in this case, the Michigan Central handled two and the Grand Trunk handled five; but it nowhere appears, nor is it claimed, that any or all of the cars were handled by both the Michigan Central and the Grand Trunk. If the Director General of Railroads operating the Michigan Central or the Federal Agent is liable in damages to the plaintiff, by reason of the condition of the hay in the two cars handled by that road, it is by virtue of a contract entered into between the plaintiff and the representative of the Director General operating that railroad. If the Director General of Railroads operating the Grand Trunk or the Federal Agent is liable in damages to the plaintiff by reason of the condition of the hay in the five cars handled by that road, it is by virtue of a contract entered into between the plaintiff and the representatives of the Director General operating that railroad. These two sets of contracts of carriage were, of course, entirely separate and not joint in any sense. It is elementary that one may not recover damages in the same action against different defendants for the breach of separate contracts. *Sleeper v. World's Fair Banquet-Hall Co.*, 166 Ill. 57. But the plaintiff contends that he brought his action against only one defendant, namely, the Director General of Railroads, and that this defendant was succeeded by the Federal Agent. He contends further that neither the Michigan Central nor the Grand Trunk were ever parties to this suit, for since the President took control of all the railroads and appointed a Director General of Railroads and later appointed a Federal Agent, the defense of this case has been at all stages in the hands of one person. This contention is not sound.

Section 10 of the Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, par. 3115¾j) pro-

vided: "That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law. * * *" In commenting on that section the court said in *Missouri Pac. Ry. Co. v. Ault*, 256 U. S. 554, 41 Sup. Ct. 593:

"The plain purpose of the above provision was to preserve to the general public the rights and remedies against common carriers which it enjoyed at the time the railroads were taken over by the President except in so far as such rights or remedies might interfere with the needs of federal operation. * * * The situation was analogous to that which would exist if there were a general receivership of each transportation system * * *. The courts were to go on entertaining suits and entering judgments under existing law, but the property in the hands of the President for war purposes was not to be disturbed. With that exception the substantial legal rights of persons having dealings with the carriers were not to be affected by the change of control. This purpose Congress accomplished by providing that 'carriers while under federal control' should remain subject to all then existing laws and liabilities and that they might sue and be sued as theretofore."

The court said further that the term "carriers" as used in the act, meant the transportation systems as distinguished from the corporations owning or operating them; that the President took over the physical properties, the transportation systems, and placed them under a single directing head, but he took them over as entities and they were always dealt with as such; that each system was to be continued to be dealt with by itself; that it is this conception of a

transportation system, as an entity, which dominates section 10 of the Act; that they are dealt with as active responsible parties answerable for their own wrongs except that levy of execution upon their property was precluded as inconsistent with the government's needs and that all doubt as to how suit should be brought was cleared away by General Order No. 50, which required that it be against the Director General by name.

In *Seaver v. Hines,* 261 Fed. 239, the plaintiff contended that the government management and control of the railroads of the country as a war measure, and under the war powers of Congress, so far consolidated or merged the various railroads of the United States into one system as to create a situation which would make it reasonable and proper to have the federal court assume jurisdiction over a cause of action, and a railroad management, foreign to the district where the suit was brought, under service of process on agents of another railroad, who were within the district, which was such service as would not have been effective to that end prior to the assumption of federal control. In holding the contrary the court pointed out that section 10 of the Federal Control Act provided that actions at law or suits in equity might be brought and judgment rendered "as now provided by law." The court then said:

"But the position is taken by the plaintiff that, since the federal control of railroad transportation systems as effectuated by the orders of the Director General, causes of action are not prosecuted against the individual carriers, but against the Director General as the representative of all the systems operated by the government.

"This position is true in a fictional sense, but not in any general or substantial sense. It is only to be accepted in an exceptional sense. The order requiring suits to be brought against the Director General, and this without regard to the question whether the Di-

rector General had authority to make it, was based upon the idea that, while government control exists as a war measure, the government is, in a certain sense, the owner of funds resulting from the operation of the lines, or at least in control of them, to be used to pay operating expenses and liabilities, subject ultimately to reasonable adjustment as between the government and the owners, and is responsible for the management of the various railroads, and therefore, as a matter of convenience and of reasonable precaution, might so far regulate court procedure as to require actions to be brought against the Director General. But this, so far as concerns procedure, aside from the name, is, in a very large sense, nominal, and it is against reason to contend that the purpose of such an order was, in a substantial sense, to consolidate and merge the various individual interests, or, in other words, the various individual railroads of the country into a single system, to the end that new remedies should be had and jurisdiction created upon a kind of service not theretofore known in legal or equitable procedure."

While the issues involved in the cases cited were not such as the one involved here, in our opinion the observations of the court referred to are applicable to the issue presented in the case at bar. The plaintiff may not prosecute separate causes of action, involving claims for damages growing out of separate contracts of carriage claimed to have been had with separate carriers, involving separate and distinct lots of goods, in the same suit and recover a joint judgment and thus be placed in a position where he may recover against the Federal Director operating one carrier, or the Federal Agent, the full amount of damages resulting from the transportation of two or more separate shipments over different roads. The Director General operating the Michigan Central, or the Federal Agent, succeeding him, can only be liable for damages resulting from the shipment over the Michigan Central and the Director General operating

the Grand Trunk, or the Federal Agent, succeeding him, can only be liable for damages resulting from the shipment over the Grand Trunk. The fact that the Director General or the Federal Agent is the same individual in both cases does not permit the prosecution of both actions in one suit and recovery of a joint judgment. The two causes of action are just as separate and distinct as they would have been had they arisen prior to federal control. Therefore, the joint judgment recovered in the case at bar cannot stand.

For the foregoing reasons the judgment of the municipal court is reversed and the cause is remanded to that court for further proceedings not inconsistent with this opinion.

*Judgment reversed and cause remanded.*

TAYLOR and O'CONNOR, JJ., concur.