Argued February 14, affirmed April 17, 1923.

## CRIPE & HARRIS *v.* DAVIS ET AL.

### (214 Pac. 343.)

**Carriers—Contract Provisions Binding After Delivery of Stock Shipment, Damaged from Causes Beginning to Operate While Livestock Still in Carrier's Possession.**

1. Where livestock is shipped under a "low value livestock contract," as prescribed by the Public Service Commission by virtue of Section 5878, Or. L., and it appears, after completed delivery, that the livestock has been damaged from a cause which began to operate while the stock was still in the carrier's possession, the contract provisions are applicable and binding on both parties.

**Carriers—Contract Provisions as to Damages and Notice of Injury to Shipment of Sheep Held Inapplicable After Delivery by Carrier.**

2. Where five carloads of sheep were shipped under a "low value livestock contract," prescribed by the Public Service Commission by virtue of Section 5878, Or. L., and after completed delivery by unloading on private spur-track some of the sheep strayed upon the main line of railroad and were killed by a train, the contract provisions as to the measure of damages and notice of injury were inapplicable, since the cause of destruction of the sheep did not begin to operate while they were in the carrier's possession.

---

1. Validity of stipulation in carrier's contract requiring notice of loss within a specified time, as applied to loss due to carrier's negligence, see notes in 9 Ann. Cas. 17; 14 Ann. Cas. 416; Ann. Cas. 1914A, 232; 17 L. R. A. (N. S.) 628.

Carriers—Delivery of Shipment by Carrier a Mixed Question of Law and Fact.

3. Delivery of a shipment by a carrier is a mixed question of law and fact.

Carriers—When Court may Instruct That Delivery has Been Made by Carrier as Matter of Law Stated.

4. Where the evidence is plain, clear and undisputed, showing that personal property was received, transported and put into the possession of, and under the dominion of, consignee at the point of destination, it is proper for the court to instruct the jury as matter of law that delivery had been made by the carrier.

Appeal and Error—Party in Whose Favor Error Operates cannot Complain.

5. Where an error has been made in refusing to give an instruction, the party in whose favor the error operated cannot complain.

Carriers—Instructions Held Sufficient to Impose upon Plaintiffs the Burden of Showing Ownership of Livestock Injured.

6. In an action against a carrier for damages to a shipment of sheep, an instruction that it was "incumbent upon the plaintiffs to show ownership of the sheep" *held* sufficiently to charge that the burden was imposed upon plaintiffs to show ownership of the sheep in themselves before they were entitled to recover damages.

Railroads—Reasonable Care Required to Avoid Killing Stock Straying on Right of Way.

7. Where a carrier completed delivery of a shipment of sheep upon a private spur-track, the fact that the sheep strayed upon the carrier's right of way and bunched themselves upon the track in front of an approaching train did not excuse the carrier from using reasonable care to avoid running down and killing the stock.

Appeal and Error—Verdict Based upon Competent Evidence Binding.

8. Where the finding of the jury is based upon some competent evidence, the verdict is binding upon the parties.

From Multnomah: ROBERT TUCKER, Judge.

Department 2.

This is an appeal from a judgment for $2,030, together with costs and disbursements taxed at $77.95, recovered in an action at law instituted by C. E. Cripe and C. W. Harris, partners, doing business under the firm name and style of Cripe & Harris, against the Director-General of Railroads, on ac-

count of alleged damages suffered by them, growing
out of injuries to sheep owned by plaintiffs.

On July 2, 1919, plaintiff shipped five carloads of
sheep from Maupin, Oregon, to Sonny, Oregon, pre-
paying the freight thereon. After the arrival of the
train at Sonny, the sheep were "spotted" on a spur-
track situate at Sonny, a flag station of the Oregon-
Washington Railroad & Navigation Company's lines.
The record discloses that the spur-track extended to
a private industry; that it was outside of the fenced
right of way, and was not situate on railroad prop-
erty. Cripe, one of the plaintiffs, went from Hood
River to Sonny on the morning of the arrival of the
sheep, to take possession of them. The unloading,
which required about half an hour, was begun at
about 6 A. M. The sheep, after being unloaded, were
in the exclusive possession of their owners. The
train took its departure westward. At about 7:30
o'clock A. M., an extra train, consisting of a locomo-
tive engine and caboose, which was engaged in pick-
ing up steel and other railroad material along the
road, arrived at Mitchell's Point, situate about a
quarter of a mile from Sonny. There is testimony to
the effect that when the train which killed the sheep
rounded Mitchell's Point, the fireman saw sheep upon
the track, and that he called the attention of the en-
gineer thereto. The engineer blew the whistle, caused
the bell to ring, and, before reaching the sheep, ap-
plied the brakes. By this time, a band of sheep had
rushed on to the track. The train plowed through,
killing and fatally crippling many of them. The
plaintiffs offered testimony to the effect that the
sheep were in plain view of the locomotive engineer
for a quarter of a mile, and that no effort was made

to stop until the locomotive approached within a short distance of the sheep. It appears from. the record that the right of way of the railroad at Sonny is fenced on both sides. The fence runs across the spur-track which leads to private property and to the place where the sheep were unloaded on mill property. Across the spur-track where it passes from the railroad right of way to the above-mentioned private property is a gate. Plaintiffs say that the crew operating the train that carried the sheep to Sonny left a car in the gateway, which made it impossible to close the gate. Through this gate the sheep, after being unloaded, escaped onto the railroad right of way.

The plaintiffs allege, in their amended complaint:

"That while said sheep were upon said main line of said railroad as aforesaid, and before plaintiffs and their employees could remove them therefrom, an engine to which was attached one car was passing over said main line of said railroad, proceeding in a general westerly direction along said railroad, and the employees of the defendant in charge thereof carelessly and negligently and willfully failed to stop or check the speed of said engine and car, although said sheep upon said railroad track were plainly visible by the persons in charge of said engine for a long distance before the same reached the point where said sheep were, and the employees in charge of said engine saw said sheep and could easily have stopped the train before reaching said sheep, but they carelessly and negligently and willfully failed so to do, but carelessly, negligently and willfully ran said engine at a high rate of speed into and over said band of sheep, whereby they were crushed, mangled and injured and ninety head of them were killed at said time, and eighty-four head thereof died very soon thereafter from injuries then inflicted by said engine running onto and over them * * ."

107 Or.—10

In answer, the defendant averred, among other things:

"That said shipment of sheep was moving from Maupin, Oregon, to Portland, Oregon (under defendant's tariffs and rates), which authorized the plaintiffs to unload said sheep in transit at Sonny, Oregon, for the purpose of placing same on the summer and fall range in the mountains south of Sonny and thereafter to be reloaded onto defendant's cars and moved to Portland, Oregon, their final destination, under a through tariff charge, and as a part of the contract covering the transportation of said sheep.

"That on or about the third day of July, 1919, the said shipment arrived at Sonny, Oregon, and that about the hour of 5 o'clock A. M. said cars were placed on the side-track commonly known as the 'mill spur,' which leads to the defendant's stockyards, and thereupon the plaintiffs' agents, who were accompanying said shipment as caretakers, instructed the defendant to 'spot' said cars a sufficient distance away from defendant's stock-pens to permit said sheep to be unloaded outside of the stockpens * * .

"That thereafter, and about the hour of 7:30 A. M. on July 3, 1919, one of defendant's west-bound trains * * was approaching the station of Sonny, and when it reached a point a short distance east therefrom the plaintiffs' sheep, which they had permitted to stray upon the fenced right of way, suddenly and without warning appeared upon the railroad track in front of said moving train such a short distance in front thereof that it was impossible for defendant's employees to stop or slacken the speed of said train in time to prevent striking said sheep, although defendant's agents blew the whistle of said locomotive, rang the bell thereof and applied the brakes. * *

"That said collision and the ensuing damage to said sheep was caused solely and alone by the carelessness and negligence of the plaintiffs' agents."

The plaintiffs denied the above matter pleaded in defense.

Upon trial, the jury found in favor of plaintiffs and against the defendant. From a judgment based upon the verdict of the jury the defendant appeals to this court and relies, for reversal, chiefly, upon the claim that the "Low Value Live Stock Contract" executed between the parties hereto was in force and effect and governed the rights of all the parties to this litigation at the time the sheep were killed. Defendant urges that the plaintiffs failed to give notice provided by Section 10 of the above-named contract, which reads:

"The shipper further agrees that as a condition precedent to his right to recover any damages for loss or injury to any of said stock, he will give notice, in writing, of his claim therefor, to some officer or station agent of the carrier, before said stock has been removed from the place of destination or mingled with other stock."

It is further urged, as a defense, that the suit cannot be maintained, by reason of the provision of Section 11 contained in the contract, which reads:

"It is further agreed and provided that no suit or action to recover for any loss or damage to said stock or for the recovery of any claim by virtue of this contract shall be sustained by any court against the carrier unless suit or action shall be commenced within sixty days after the shipper has received notice of the carrier's refusal to pay the same, and in any suit or action commenced against the carrier after the expiration of said sixty days, the lapse of time shall be taken and deemed conclusive evidence against the validity of said claims."

Again, the defendant urges that it was entitled to a directed verdict for the reason that plaintiffs failed to prove that they were the owners of the sheep that

were killed, and that the plaintiffs unloaded their sheep on depot grounds at Sonny and negligently permitted them to scatter along the railroad track in a place of known danger.

The defendant also asserts that the court erred in the matter of instructing the jury.        AFFIRMED.

For appellant there was a brief over the names of *Mr. A. C. Spencer* and *Mr. W. A. Robbins,* with an oral argument by *Mr. Arthur A. Murphy.*

For respondents there was a brief over the names of *Messrs. Angell & Fisher* and *Mr. W. H. Wilson,* with an oral argument by *Mr. Homer D. Angell.*

BROWN, J.—Under Section 5878, Or. L., the Railroad Commission, now designated by law the "Public Service Commission," is required to prescribe a just and reasonable live stock contract, to be used by all railroads when shipments of live stock are offered between points wholly within the State of Oregon.

The record before us discloses that on December 7, 1919, the Commission, pursuant to statute, prescribed the form of live stock contract pleaded and received in evidence in this case. The contract executed between the shipper and the railroad company, known as the "Low Value Live Stock Contract," contained certain conditions precedent to the plaintiffs' right to recover damages for injury to their sheep. Under the terms of that contract, they were required to give notice in writing of their claim, to some lawful agent of the carrier, before the sheep were removed or mingled with other stock. And it is a further condition thereunder, that no action to recover damages for injury to the sheep by virtue of the shipping contract shall be sustained by any court, unless the same shall

have been commenced within sixty days after the shipper has received notice of the carrier's refusal to pay. The contract also contains a clause whereby it is agreed that the valuation of the sheep thereunder shall not exceed $3 per head.

For a case illustrating the reason for the necessity of prompt presentation of such claim, see *Smith Meat Co.* v. *Oregon R. & N. Co.*, 59 Or. 206 (117 Pac. 303).

That the provisions of this contract were in full force and effect during the transportation and the unloading of the sheep at Sonny must be conceded. If the injury to plaintiffs' property occurred while the provisions of the shipping contract were in force, the plaintiffs' right to recover is governed by the provisions of that contract and such recovery is limited to a damage of not to exceed $3 per head. But the plaintiffs' theory of the case is that the railroad performed its full duty as a carrier and delivered its shipment of sheep to them at Sonny, thereby terminating its liability under the terms of the contract. This claim is controverted by defendant and an issue between the plaintiffs and the defendant is thus made as to whether or not delivery was complete at the time the sheep were killed. It is not disputed that the sheep were transported from Maupin to Sonny, Oregon, under the terms of the Low Value Live Stock Contract entered into in order that plaintiffs might secure the benefit of a lower charge for transportation.

The shipping contract relied upon by the defendant provides, in part:

"Maupin, Oregon Station, July 2, 1919.
"This agreement, made the day and year above stated, between Oregon-Washington Railroad & Navi-

gation Company, hereinafter called the 'Carrier,' and Cripe & Harris, hereinafter called the 'Shipper,' WITNESSETH:

"That the shipper, having loaded 1519 head of sheep in cars as designated in the margin hereof, consigned to Cripe & Harris, at Sonny, Oregon, the carrier hereby agrees to transport the same from Maupin to Sonny."

The following language is written in pencil across the contract:

"Final destination Portland, for feed and grazing at Sonny."

The evidence proves that the freight was prepaid by the shipper from Maupin to Sonny.

The sheep were unloaded at Sonny and received by the shipper at that point. Some sixty days later, after the sheep had been herded upon the range in the vicinity of Sonny, some two carloads of them were shipped on to Portland, and later the remainder were returned to the home range. It was the intention to transport these sheep from Maupin to Sonny and run them upon the mountain range during the summer, and, when fattened, to ship the mutton sheep on to Portland, which was done. Those that were not fit for the butcher's block were returned to the home range, as was originally intended. When the sheep were shipped from Maupin, and on their arrival at Sonny, at the request of plaintiffs the freight-cars in which they had been transported were "spotted" upon the "mill spur" track on ground belonging to a mill company, from which the shipper had obtained range for the sheep. That spur-track is not on railroad property, and is separated by a fence from the railroad right of way. The evidence discloses that the sheep were unloaded, given over to the exclusive possession of the shipper, and the train crew

had departed from Sonny a full half hour before the injury to the sheep occurred. No member of the train crew or any representative of the railroad company had anything to do with the custody of the sheep at the time of the accident whereby the sheep involved in this controversy were killed. Nothing remained to be done by the carrier in completion of its contract safely to carry and deliver the sheep to the shipper at Sonny, the point of destination: *Gregg* v. *Illinois Central R. R. Co.,* 147 Ill. 550 (35 N. E. 343, 37 Am. St. Rep. 238), and valuable note with the cases collected. The shipper, with the carrier's consent, took possession of, and assumed full dominion over, the sheep at Sonny. The fact that after delivery the sheep were permitted to remain for a time in the vicinity of the railroad right of way, and that some of them strayed upon the track, imposed no liability upon the carrier under the shipping contract in the case at bar: *Vaughn* v. *New York, N. H. & H. R. R. Co.,* 31 R. I. 235 (61 Atl. 695). The contract between the parties hereto is a carrier's contract for transportation of the sheep, not a herder's contract.

1. Defendant says:

"Assuming that there was a completed delivery to plaintiffs at Sonny, if the damage to the sheep was due to a cause which began to operate while the sheep were still in defendant's possession, the contract provisions would still be applicable and bind both parties."

2. This is a correct statement of the law: 5 Am. & Eng. Ency. of Law (2 ed.), p. 446; 10 C. J., pp. 247, 248. However, the doctrine contended for above does not apply to the facts in the present case. There are a number of illustrative causes wherein that principle is applicable, one of which is *Bilby* v. *Chicago*

*etc. Ry.,* 184 Mo. App. 644 (171 S. W. 39, 41). In that case, the railroad company was sued for loss of hogs after delivery to the consignee. The action arose out of the fact that the railroad company had failed to give the hogs proper attention while transporting them during hot weather, and had also failed to furnish proper watering facilities upon their arrival at their destination. The opinion says:

"From Olathe on to Quitman, a distance of about 150 miles, the hogs were frequently drenched with water in the cars but were given no water to drink except what they could lick up from the floor. They arrived and were unloaded at Quitman about 1 o'clock in the afternoon, undamaged, but hot and thirsty. Plaintiff and his assistants were there to receive them. The stock-pens were in a low, hot place, and the hogs immediately began to suffer from heat and thirst. Defendant had a well at the station, but the pump was out of order, and plaintiff, unable to procure water for the hogs, and fearing they would die if left in the pens during the afternoon, proceeded to drive them to one of his farms three miles away. After they had traveled a mile or more, the hogs, in the utmost distress, piled up in wayside ditches and thirteen died. The others, when they reached the farm, were much injured by their sufferings."

The case is likewise in point on the question of delivery. In that case the plaintiff took charge of the hogs immediately when they were unloaded from the cars into the pens. It was the contention of the railroad that delivery was made to him at that time and that for that reason no cause of action inured to him from the damage subsequently caused by the failure to provide watering facilities for the purpose of watering the hogs while in the pen. The court, on appeal, decided that delivery of the hogs to plaintiff was made when they were unloaded from the cars and placed in the custody and under the con-

trol of plaintiff. Now, recurring to the care of the stock, the court held that hogs in transportation in. hot weather require care and attention to prevent them from injury, and that it was the duty of defendant to provide proper facilities and means for the reasonable prevention of injury from overheating and thirst; that in addition to throwing water on the hogs occasionally, it was the duty of the transportation company to give them water to drink to prevent injury from thirst. The evidence showed that the proximate cause of the injury was the negligent acts of the company in failing to water the hogs while being transported and in neglecting to provide facilities for watering them after they were unloaded.

That case affords an illustration of loss occurring after delivery of stock to the owner, from a cause which began to operate while they were in the carrier's possession.

But in the case at bar, the sheep were run over and killed by a locomotive engine after they had been delivered into the possession of the owner by the carrier, and the cause of their destruction did not begin to operate while they were in the carrier's possession. If the sheep had died from injuries received through the carrier's negligence during the life of the contract, then it would be a case of loss from a cause which began to operate while the stock were in the care and possession of the carrier.

3. The defendant asserts that reversible error was committed by the court because it submitted to the jury the question as to whether delivery of the sheep to the shipper was made at Sonny prior to the killing of the stock, and cites *Schulte* v. *Pacific Paper Co.,* 67 Or. 334, 337 (135 Pac. 527, 136 Pac. 5) ; *Oberlin* v. *Oregon-*

*Washington R. & N. Co.,* 71 Or. 177, 187 (142 Pac. 554); *Hoag* v. *Wash.-Or. Corp.,* 75 Or. 588, 596 (144 Pac. 574, 147 Pac. 756).

Delivery is a mixed question of law and fact: *Vaughn* v. *Vaughn,* 272 Ill. 11, 22 (111 N. E. 566); *Weigand* v. *Rutschke,* 253 Ill. 260, 263 (97 N. E. 641).

4. Where the evidence is plain, clear and undisputed, showing that the personal property was received, transported and put into the possession and under the dominion of the consignee at the point of destination, it would be proper for the court to instruct the jury, as a matter of law, that delivery of the freight had been made by the carrier: *Whitney Mfg. Co.* v. *Railroad Co.,* 38 S. C. 365 (17 S. E. 147, 37 Am. St. Rep. 767).

5. In the case at bar, the court refused to instruct, as a matter of law, that delivery of the sheep had been or had not been made, but left this question to be determined by the jury. That ruling could not have injured the defendant. If any error was committed by the court in that respect, it was in favor of the defendant and against the plaintiffs, and they are not complaining.

6. The defendant excepts to the court's instruction relating to the ownership of the injured sheep. The instruction was brief, but it was plain and to the point. It reads:

"It is incumbent upon the plaintiffs to show ownership of the sheep—ownership of the stock."

A jury would understand, from that instruction, in connection with the whole charge, that a burden is imposed upon plaintiffs to show ownership of the sheep in themselves, before they are entitled to recover damages.

7. The fact that in the case at issue plaintiffs' sheep were upon the defendant's right of way, and that they had bunched themselves upon the track in front of the approaching train, did not excuse the defendant from using reasonable care so as to avoid running down and killing the stock: *Moses* v. *Southern Pac. R. R. Co.,* 18 Or. 385, 398 (23 Pac. 498, 8 L. R. A. 135); *Keeney* v. *Oregon Ry. & Nav. Co.,* 19 Or. 291, 292 (24 Pac. 233); *Richardson* v. *Portland Ry., L. & P. Co.,* 70 Or. 330, 336 (141 Pac. 749).

We have considered the motions for nonsuit and directed verdict, and find that the court committed no error in denying them.

We have examined all questions relied upon in defendant's brief, but we are compelled to hold that reversible error is not found in the record.

8. We cannot weigh the evidence in this cause. We can search the record for the purpose of ascertaining if each and every material allegation of the complaint is sustained by some competent evidence. When we have done that, our duty and power in relation to the evidence ends. The jury, the exclusive judges of the facts, having had some competent evidence upon which to base their finding, returned a verdict that binds the parties to this litigation.

This case is affirmed.                    AFFIRMED.

McBRIDE, C. J., and BEAN and McCOURT, JJ., concur.